## SECURITIES AND EXCHANGE COMMISSION, Plaintiff,

v.

**Thomas Edward CAVANAGH, U.S. Milestone, Electro–Optical Systems, Corp., George Chachas, Thomas R. Brooksbank, William N. Levy, Optimum Fund, Agira Trading, Ltd., Customer Safety, S.L., Cambiarios, S.L., Construcciones, S.L., Thomas A. Hantges, Cosimo Tacopino, Defendants.**

**Karen Cavanagh, Cromlix, LLC, Donald & Co. Securities Inc., Shbl Associates Europe Ltd., Joseph Falco, Martin Hodas, Bernd Stieghorst, Erin Martin, Anthony S. Luttenberger, Ana P. Lopez, Tamar Lehman, Metropolitan Trade Finance Ltd., Tim Timlin, Carmillo Monastra, Eugene Stricker, Arthur de Acutis, Jean–Pierre Neuhaus, Kenneth C. Kehoe, and Antonio V. Borotto, Relief Defendants.**

No. 98 CIV. 1818(DLC).

United States District Court, S.D. New York.

April 20, 1998.

Larry P. Ellsworth, Mark J. Kreitman, Daniel J. Hurson, Securities and Exchange Commission, Washington, DC, for S.E.C.

Harold Ruvoldt, Fishbein Badillo Wagner Harding, New York, NY, for Cavanagh and U.S. Milestone.

Sanford Remz, Hutchins, Wheeler & Dittmar, Boston, MA, for Electro–Optical Systems Corp.

David Spears, Linda Imes, Richards Spears Kibbe & Orbe, New York, NY, for Chachas.

Irving Einhorn, Los Angeles, CA, for Chachas.

Edward Medvene, Talcott, Lightfoot, Vandevelde; Sadowsky, Medvine & Levine, Los Angeles, CA, for Brooksbank.

Charles J. Hecht, Hecht & Steckman, P.C., New York, NY, for Levy.

Martin Kaplan, Gusrae Kaplan & Bruno, New York, NY, for Tacopino.

Diana D. Parker, Morvillo, Abramowitz, Grand, Iason & Silberberg, P.C., New York, NY, for Tamar Lehman.

Paul May, Steere & May, New York, NY, for Tim Timlin.

## OPINION

COTE, District Judge.

This case concerns a scheme through which the defendants reaped millions of dollars in profits at the expense of the American investor by creating active trading in the United States securities market without making the disclosures that were required for the benefit of the investing public by the Securities Act of 1933.

Specifically, in this action, which was filed on March 13, 1998, the Securities and Exchange Commission ("SEC") alleges that the defendants offered and sold securities of Electro–Optical Systems Corporation ("EOSC") in violation of the registration and antifraud provisions of the United States securities laws, codified at 15 U.S.C. §§ 77e ("Section 5") and 77q(a) ("Section 17(a)"), and 15 U.S.C. § 78j(b) ("Section 10(b)"). According to the SEC, the defendants defrauded the public—primarily small, on-line investors—of at least $5 million over the course of the scheme, the profits of which allegedly have been distributed among the defendants and relief defendants. In the underlying action, the SEC seeks, with respect to each of the defendants, a permanent injunction against future violations of the securities laws, and civil penalties, as provided for under 15 U.S.C. § 78u(d)(3).[1] The SEC also seeks disgorgement of all proceeds related to the scheme, plus pre-judgment interest, from all of the defendants and relief defendants.

Pending a resolution on the merits, the SEC seeks a preliminary injunction against the defendants and a continued freeze on their assets sufficient to satisfy whatever

---

1. The SEC seeks an injunction against future violations of Section 5 as to the following defendants: Thomas Cavanagh, Milestone, EOSC, George Chachas, Thomas Brooksbank, William Levy, Optimum Fund, Agira Trading, Customer Safety, Cambiarios, Construcciones, Thomas Hantges, and Cosimo Tacopino. The SEC seeks an injunction against future violations of Sections 17(a) and 10(b) as to the following defendants: Cavanagh, Milestone, EOSC, Chachas, Optimum Fund, Customer Safety, Cambiarios, Construcciones, and Tacopino.

proceeds plus pre-judgment interest and civil penalties, if any, for which the defendants ultimately are found liable. The SEC also seeks a continued freeze on the assets and stock of the relief defendants that are traceable to the allegedly unlawful activities at the heart of this action.

On March 13, 1998, this Court issued a temporary restraining order (the "March 13 Order" or "TRO") which, *inter alia,* suspended trading by the defendants in EOSC stock; froze the assets of the defendants and the accounts of the relief defendants that contained EOSC stock or the proceeds from sales of the stock; ordered an accounting of the defendants' assets; and required the repatriation into the United States of all proceeds from the sales of EOSC stock by the defendants, to be deposited into the registry of the United States District Court for the Southern District of New York.

The March 13 Order also set forth an expedited discovery and briefing schedule for a preliminary injunction hearing, which was modified in subsequent conferences with the parties. By its own terms, the TRO provided that it would remain in effect "pending determination of the Commission's Motion for a Preliminary Injunction." The hearing, which was originally scheduled to begin on March 25, was put over to March 31 at the request of the defendants and the relief defendants who had appeared in the action, each of whom felt that they needed more time to prepare.[2]

In the course of the hearing on the SEC's motion for preliminary relief, the SEC entered into stipulations with several of the defendants and relief defendants that modify the terms of the freeze order.[3] Three defendants also have reached agreements with the SEC disposing entirely of the SEC's motion for preliminary relief insofar as it concerns them. Namely, Cosimo Tacopino ("Tacopino"), the trader at Donald & Co. who placed many of the trades in EOSC shares at issue here, has consented to the Court's entry of a preliminary injunction against future violations of Sections 5, 17(a) and 10(b) against him, and has deposited a total of $352,279.14 in the Court's registry pending a resolution of this case. EOSC, the company whose stock is at issue in this case, has entered into an agreement with the SEC whereby the SEC has withdrawn its motion for preliminary relief against the company. Defendant

---

**2.** This delay was agreed to off-the-record during a telephone conference call between the parties and the Court on the Sunday before the hearing initially was to begin. None of the defendants or relief defendants stated at that time any qualification on their consent to an extension of the TRO, nor did any defendant or relief defendant raise an objection to the extension of the TRO pending the Court's determination of the SEC's motion, with the exception of relief defendant Tamar Lehman, who on April 2 first raised her objection to the extension of the TRO beyond April 2. On April 3, Lehman filed an appeal from the TRO to the Second Circuit. Cavanagh and Levy, who joined Lehman in appealing the TRO prior to this Court's issuance of an Opinion, *never* raised any objection at any time to the TRO's continuation pending the Court's ruling on the merits of this motion.

The Court had originally scheduled the hearing to begin on March 25 because of the severity of the measures embodied in the TRO. The defendants and relief defendants consented to an extension of the TRO when they learned that the President of WTS, Charles Weaver, had decided to assert his Fifth Amendment privilege and that other employees of WTS would need to be identified and interviewed. The March 31 hearing date was agreed to by all parties and no length for the hearing was determined in advance.

**3.** To date, defendants Levy and Chachas have entered into such agreements with the SEC, which required these defendants to deposit such sums into the Court's registry or counsel's escrow accounts, respectively, as would be necessary to disgorge the full amount of proceeds alleged to have been wrongfully obtained. Levy's agreement, so ordered by the Court on April 2, required him to deposit $170,000 in cash into the Court's registry, plus all 500,000 shares of restricted EOSC stock held by Levy. Chachas' agreement, so ordered by the Court on April 2, required Chachas to deposit $393,000 plus all remaining EOSC shares owned by Chachas into his lawyer's escrow account pending further order of the Court. Relief defendant Anthony Danna has also reached an agreement with the SEC, so ordered by the Court on March 23, regarding the funds held in his Attorney Trust Account. In addition, EOSC entered into an agreement with the SEC, so ordered by the Court on March 26, agreeing to the release of $30,000 from EOSC's frozen assets. Finally, relief defendant Eugene Stricker has reached an agreement with the SEC, so ordered by the Court on April 14, lifting the freeze on Stricker's assets upon his depositing the sum of $5,250.00, representing all of his trading proceeds for transactions in EOSC stock, in the Court's registry.

Donald & Co. has entered into an agreement with the SEC providing for a sum of $233,811.07 to be deposited in the Court's registry pending a resolution of this matter and withdrawing the SEC's motion for a preliminary injunction as to this defendant.

Although all of the defendants have been served, many of them—including all of the foreign defendants—have failed to appear in this action. Defendant Thomas A. Hantges ("Hantges"); the Spanish entities, Customer Safety, S.L., Cambiarios, S.L., and Construcciones, S.L. (collectively "the Spanish entities"); and the Caribbean entities, Optimum Fund ("Optimum") and Agira Trading ("Agira"), were served but have not appeared. All of the relief defendants have been served, with the exception of the following individuals and entities: Kenneth Kehoe, Erin Martin, SHBL Associates Europe Ltd., Bernd Stieghorst ("Stieghorst"), Metropolitan Trade Finance Ltd., Jean–Pierre Neuhaus, and Carmillo Monastra. The Court does not consider the claims brought by the SEC against those relief defendants who have not been served.

The hearing on the SEC's motion for a preliminary injunction began on March 31, 1998 and continued through April 8, 1998. The Court took direct testimony in the form of affidavits from each of the following witnesses, who were also cross-examined at the hearing: Cameron Funkhauser, who works in the Department of Market regulation of the National Association of Securities Dealers ("NASD"); Galen O'Kane, an investor who bought EOSC shares through the internet; John Chachas, George Chachas' brother and a banker at First Boston; Richard Day ("Day"), the transfer agent for Curbstone Acquisition Corp. ("Curbstone") and EOSC; Ara Proudian ("Proudian"), the trader who bought shares pursuant to an order by Cavanagh on December 19; Jeffrey Bruss ("Bruss"), who prepared a stock report about EOSC in January 1998 for his internet publication, The Future SuperStock; and Richard Tucker, an expert on securities law offered by defendant Cavanagh. The Court also received the affidavits and cross-examination of defendants Thomas Cavanagh ("Cavanagh"), George Chachas ("Chachas"), Thomas Brooksbank ("Brooksbank"), and William Levy ("Levy"), and relief defendant Anthony Luttenberger. Chris Chaleki, an engineer at EOSC, also performed a demonstration of EOSC's product in Court and was subject to cross-examination, although he did not provide an affidavit in advance.

The Court has also received voluminous documentary evidence and deposition testimony in support of, and in opposition to, the SEC's motion. The Court has reviewed all of this evidence carefully, in addition to the legal briefing provided by counsel.

For the reasons set forth below, the Court finds that the SEC has made a proper showing that defendants Chachas, Brooksbank, Hantges, Levy, Cavanagh, U.S. Milestone ("Milestone"), Customer Safety, Cambiarios, Construcciones, Optimum, and Agira violated Section 5 of the Securities Act of 1933 ("the Securities Act"), and that these defendants may be found liable at trial for disgorgement of proceeds plus penalties for their violations. The Court finds that a preliminary injunction against future violations of Section 5 of the Securities Act is properly entered, however, only with respect to defendants Cavanagh, Milestone, Levy, Chachas, Customer Safety, Construcciones, and Cambiarios, as to each of whom the SEC has established a likelihood of repetition.

The SEC also has made a proper showing that defendants Cavanagh, Milestone, Customer Safety, Cambiarios, Construcciones, and Chachas violated Section 17(a) of the Securities Act and Section 10(b) of the Securities Exchange Act of 1934 ("the Exchange Act"), and that these defendants may be held liable at trial for disgorgement of proceeds and penalties associated with their violations. Because the SEC has demonstrated a likelihood of repetition as to Cavanagh, Milestone, Customer Safety, Construcciones, and Cambiarios, a preliminary injunction against future violations of Sections 17(a) and 10(b) is properly entered against these defendants.

To preserve the status quo pending a final determination of this matter, the Court extends the freeze order contained in the TRO, except with respect to those defendants and relief defendants, set forth above, with whom the SEC has reached agreements in lieu of,

or modifying, the terms of the freeze order embodied in the TRO. As to those defendants and relief defendants, the terms of their agreements with the SEC shall remain in effect pending the final resolution of this case.

## I. *FINDINGS OF FACT*

The scheme alleged by the SEC involves a broad cast of characters and a complicated series of events. In brief, the SEC alleges that a malevolent investment banker, Cavanagh, and his lawyer, Levy, approached a development stage company, WTS Transnational, Inc. ("WTS"), that had a dire need for capital. These two then set in motion a plan that had little to do with raising funds for WTS, but instead was designed to line their pockets. The scheme called for Cavanagh and his nominees to obtain for pennies a large block of shares of the company just as it merged with a public shell company.[4] Cavanagh and his nominees would then sell the shares into the public market at prices that they would help to inflate. The success of the scheme depended on the participation of the shareholders of the shell company, who would transfer to Cavanagh and his nominees their "affiliate" shares of the shell company.

The recitation of facts that follows sets forth more specific findings about the individuals and entities involved in this scheme and the sequence of events.

### A. *The "Cast of Characters"*

#### 1. The Operating Company

WTS is a Massachusetts corporation with its principal place of business in Massachusetts. WTS was founded in 1990 by Charles Weaver ("Weaver"), a former employee of Texas Instruments and Honeywell, who is now 56 years old. According to the December 23, 1997 Form 8–K filed with the SEC ("December 23 8–K"), WTS

developed and [was] in the process of producing state-of-the-art fingerprint biometric systems for the information security and access control market segments ... [that would] eliminate obnoxious and manifold passwords or personal identification numbers and replace them with biometric verification of the individual.

Weaver has invoked his Fifth Amendment privilege against self-incrimination and refused to testify in this lawsuit.

As of September 30, 1997, WTS had $10,000 in assets and $655,000 in current liabilities, including $359,000 in accounts payable and $172,000 in deferred compensation. The payroll and related expenses for the nine months ended September 30, 1997 was $31,000.

#### 2. The Investment Banker

Milestone, a New York corporation, is an investment banking company specializing in Regulation S offerings.[5] Its principals are Cavanagh and Frank Nicolois ("Nicolois"), each of whom owns 50% of the company. In 1993, Cavanagh was fined $20,000 by the NASD and barred from association with any NASD member in any capacity for failure to provide testimony or to respond to NASD requests for information concerning transactions and activities in which he was involved while employed at a NASD member firm.

#### 3. The Lawyer

Since 1991, Levy has been Milestone's attorney and has structured and negotiated the terms of the Regulation S transactions in which Milestone has acted as a distributor. Levy is a securities attorney and the sole lawyer at the law firm of Levy & Levy, in

---

**4.** The Court uses the words "merged" and "merger" throughout this Opinion as a shorthand, rather than a legal term of art, in describing the transaction between WTS and Curbstone that is at the heart of this case. Strictly speaking, the transaction was a "reverse stock acquisition," whereby WTS was acquired by Curbstone, but WTS' management replaced Curbstone's at the helm of the combined entity.

**5.** A Regulation S offering is an offering that is exempt from the registration requirements of the Securities Act because it is made to overseas investors. *See* Offshore Offers and Sales, Securities Act Release No. 6863 (April 24, 1990), 1990 WL 311658 (S.E.C.); 17 C.F.R. §§ 230.901 *et seq. See also* Louis Loss and Joel Seligman, *Fundamentals of Securities Regulation* 160 (3d ed.1995).

Voorhees, New Jersey. He has on occasion brought corporate merger partners together, marrying a blank check company[6] with one that has an operating business.

In 1975, the Second Circuit affirmed the entry of a preliminary injunction against Levy for his participation in a securities fraud that bears remarkable similarities to the instant endeavor. *See SEC v. Management Dynamics, Inc.*, 515 F.2d 801 (2d Cir. 1975). In that prior action, Levy brought together a shell and an operating company, participated in the review and issuance of two misleading communications to the public regarding the merged entity, and facilitated the offering of unregistered shares for sale that did not bear any restrictive legend when they should have. Levy's codefendants created a false appearance of greater interest in the stock of the company than was justified, resulting in an increase of the company's share trading price from 38 cents to as high as $6 within a six month period. *See id.* at 806. Levy was thereafter permanently enjoined from violating the antifraud and registration provisions of the same securities laws upon which the SEC is suing here. *Id.* at 809–10.

### 4. The Broker

During the critical time at issue here, Cavanagh directed significant trading through Tacopino, a registered representative at Donald & Co., which is a registered broker-dealer in New Jersey. Tacopino has invoked his rights under the Fifth Amendment and refused to testify in this action.

### 5. The Shell Company

Curbstone was a blank check or shell corporation that existed for the purpose of merging with a private company with business operations. Its officers and directors during the critical times at issue here were Chachas and Brooksbank.

Chachas is a corporate and securities lawyer with the two partner law firm of Wenthur & Chachas in La Jolla, California. The firm's clients are primarily small, privately-

held corporations, for whom Chachas prepares private placement memoranda and files periodic reports. Chachas and Brooksbank were law school classmates and have been friends for the past 10 years.

Brooksbank is an attorney with Brooksbank & Associates in Las Vegas, Nevada. In 1990, Hantges, who is in the securities business and had at that time just attained control of Curbstone, brought Brooksbank into the company with him. Shortly thereafter, Brooksbank asked Chachas to prepare quarterly and annual reports for Curbstone, whose SEC filings were no longer current. Over the succeeding years, Chachas prepared corporate resolutions, drafted amended articles and by-laws, worked with auditors and prepared annual reports for Curbstone.

In early 1996, Brooksbank, Chachas, and Hantges decided to restructure Curbstone and to get it listed on an exchange. Chachas asked Jim Franklin ("Franklin"), a business acquaintance of Chachas from San Diego, for assistance in getting Curbstone listed.

On November 6, 1996, Curbstone filed an S–8 registration statement with the SEC that registered 3,500,000 shares. Day of ARTCO, Curbstone's transfer agent, issued certificates for the registered shares without any restrictive legend. Thereafter the shares were quoted on the NASD electronic quotation medium referred to as the OTC Bulletin Board. Four individuals, Chachas, Brooksbank, Hantges, and Franklin ("the Curbstone Management" or "Management Shareholders"), each held just under 25%, and together held 97.33% or 3,427,506 shares ("the Management Shares") of the Curbstone common stock as of late 1997. Each of the four Curbstone principals had invested approximately $6,000 in setting up and managing the company. It was their hope that from any merger they would collectively receive $125,000 for this collective investment of $24,000 as well as some stock in the new entity for long-term investment purposes.

By late 1997, Chachas and Brooksbank were the sole officers and directors of Curb-

---

**6.** A blank check company is a company that has no operating business but exists for the purpose of merging with an operating company.

stone. Throughout the course of the transactions at issue here, the Management Shares were treated as one block and all negotiations about the block were managed by Chachas. Thus, although only Brooksbank and Chachas held control positions at Curbstone, in the sense that they were officers and directors, the Court refers to the block of shares held by the four shareholders as the "Management Shares" because for all practical purposes they were one block under the control of Chachas.

## B. *The Events*

### 1. Milestone agrees to raise equity for WTS.

WTS had an idea and needed cash in order to rent space in which it could produce what it called a "pre-production unit" that could be shown to potential customers.[7] Maier Lehman ("Lehman") introduced Cavanagh to WTS representatives at a meeting in New York City on July 15, 1997, that was attended by Lehman and two other persons involved in the search for financing for WTS, Michelle Weiss ("Weiss") and Ari Friedman ("Friedman"). After the merger, Cavanagh gave Lehman, Weiss, and Friedman unlegended[8] Curbstone stock as a "finder's fee" to compensate them for their roles in introducing Milestone to WTS. Not long after the July meeting, Milestone agreed to act as investment banker for WTS.

The initial understanding between WTS and Milestone is set out in a letter of intent "effective" September 22, 1997. Milestone represented that it is in the business of assisting corporations in raising equity capital through private placement of a company's stock. The letter described, *inter alia*, an intent to enter into an agreement whereby Milestone would have the exclusive right to raise $1 million in equity capital for WTS in a private placement offering in exchange for an aggregate of 30% of the WTS common stock, and after raising such funds would have a one year option to raise an additional $3 million for another 10% of the stock. It was expected that half of the $3 million, or $1.5 million, would be provided to WTS within five months of its receiving the initial investment of $1 million. Through this financing arrangement WTS indicated a willingness to give up 40% of its stock ownership in exchange for $4 million.

At this same time Milestone was looking for a shell into which WTS could be merged. Cavanagh asked Levy to locate such a candidate and Levy began to deal directly with WTS. Although Levy was retained by WTS as its counsel on December 12, and represented WTS at the time it was acquired by Curbstone, the initial dealings between Levy and WTS were far from smooth. By November 5, 1997, WTS's Weaver was complaining to Milestone about the status of negotiations with Levy. Specifically, the private placement memorandum that Levy had developed for WTS reflected WTS giving up 40% of its stock for a $1 million investment. While WTS believed that a finder's fee of 10% of the money raised was reasonable to compensate an investment banker for its work, it opposed giving up 10% of the company's equity as a finder's fee, particularly since there was an additional $2.5 to $3 million to raise after the first $1 million had been found. As described in the letter, Levy was pushing for a merger with a shell to coincide with the $1 million investment, although WTS's Weaver didn't understand that those events had to coincide.[9]

The complaints about Levy continued. In a memorandum labelled "status of letter of

---

7. The pressures on WTS to close a deal for financing are set forth in a letter sent by Weaver to Milestone's Nicolois on November 5, 1997. In that letter, Weaver indicated that the company had already lost one prime opportunity to rent space because of its lack of funds. Weaver stated, "[w]e will not sign for space until we are sure that we have the first $1 million in hand."

8. So-called "unlegended" stock has no "restrictive legend" on it, meaning that the stock bears no representation on its face that the purchaser is limited in his or her ability to transfer the stock. By contrast, a "legended" share might inform the purchaser that the stock was transferred pursuant to a special type of offering, has not been registered, and may not be sold freely into the public market.

9. Weaver stated in the November 5 letter, "[i]t was our understanding that the shell was not necessarily required for closing on the $1 million."

intent," which responded to a proposed letter of intent sent by Levy to WTS on November 7, WTS complained vociferously to Milestone about Levy's proposal. WTS believed that its original understanding with Milestone was fair to all concerned. It contemplated that WTS would give up 40% of its equity in return for an investment of $4 million dollars, $3 million of which would be invested four to six months after the initial investment. WTS planned to use the first $1 million invested in the company to produce "preproduction units that demonstrate performance and actual production costs." With the "hardware" that would result from such work, WTS expected that Milestone would be able to find an investor to place the next $3 million into the company. Although the document is somewhat confusing on this point, it appears that WTS contemplated that Milestone would be compensated for its work by retaining that portion of the 40% in equity that Milestone did not require in order to entice the $4 million investment, or if Milestone did not use any of its own money, it would be entitled to a finder's fee of 10% and legal fees of 5%. Consequently, WTS expected to receive $850,000 of the first $1 million investment.

In contrast, Levy's proposal treated the investors, whom WTS considered a "key" ingredient to its success as a business, "almost [as] an after thought [sic]." [10] Levy wanted WTS to exchange 40% of its equity for $1 million and to give Milestone thereafter the right to raise an additional $3 million for an additional 600,000 shares, which Levy suggested should be priced at $5 per share. Under Levy's plan, 10% of WTS's equity would be used as a finder's fee for Milestone and the investment of $3 million would result in a market capitalization of $53 million. The author pointed out that a finder's fee of 10% was customary and that a market capitalization of $53 million was "*astronomical* at this stage." (Emphasis added.) WTS predicted that the next investor would "rachet" down the $5 per share price. In contrast, WTS estimated that the appropriate market capitalization at the point at which $1 million was invested was approximately $3.4 million, and after an investment of all $4 million, approximately $10 million.[11]

Finally, a Letter of Intent effective November 13, 1997, was executed by Weaver and Nicolois on behalf of WTS and Milestone, respectively. Milestone agreed to use its best efforts to have Milestone or its clients advance to WTS $1 million as a note convertible into 30% of WTS's issued and outstanding common stock. It was also the intention of the parties that WTS would become a wholly-owned subsidiary of a publicly traded company before December 15, 1997, with WTS shareholders receiving 95% of the issued and outstanding capital of the new company and the shell's shareholders retaining 5%. Milestone would then convert its note and receive shares in the new entity "in proportion to its then ownership of WTS." The letter also required WTS to issue 6,054 shares (amounting to 10% of the entity's outstanding stock) to be registered in the name of Milestone, subject to repurchase by WTS or the new entity if Milestone failed to make an investment of $3 million in the stock of WTS or the new entity. It was contemplated that investors would purchase up to 5,000 shares of WTS for $3 million, with a $1.5 million investment being made by May 31, 1998, and the remaining $1.5 million invested by September 30, 1998.

---

**10.** Indeed, Weaver's letter responding to the November 7 memorandum by Levy is replete with references to Weaver's disappointment in Levy's proposals, and his diminishing confidence that Milestone had WTS' interests at heart. The subtext of the letter, taken as a whole, is that Weaver suspected Levy and Milestone of unethical behavior that would redound to the harm of innocent investors and WTS. In addition to the passages already quoted in the text of this Opinion, Weaver stated that Levy appeared to have "ignore[d] industry norms in pricing this deal." Weaver further stated that "[a]s our investment banker, we expect [Milestone] to do the things that maximize the value of WTS and watch out for WTS'

interest. Our faith is shaken that this indeed happens to be the case." Finally, Weaver stated, "Levy's proposal has also raised a lot of ethical questions about how the 40% equity in WTS will be distributed and utilized to the raise funds for WTS."

**11.** Converted into the approximately 21 million shares issued by EOSC, WTS' estimates of the appropriate market capitalization are $.16 per share at the time of the $1 million investment and $.47 per share at the time of the $4 million investment.

On November 20, 1997, one week after the Letter of Intent was executed, Weiss and Friedman executed a consulting agreement in which Milestone "acknowledged[d]" the consulting services they had rendered in connection with WTS and agreed to issue 150,000 shares of common stock to them in the event that WTS became a publicly traded company as a result of Milestone's efforts in full satisfaction for their consulting services.

### 2. Milestone secures a bridge loan.

As is apparent from the negotiations among Milestone, Levy, and WTS, WTS was in urgent need of $1 million. In November 1997, Cavanagh arranged with Stieghorst, a director of Optimum Fund, a Grand Cayman entity, for the Fund to make a $500,000 bridge loan to WTS, convertible into equity.

In December 1997, and contemporaneous with the acquisition described below, Milestone oversaw a $1 million offering of EOSC shares. Specifically, the Optimum Fund bridge loan was converted into 1,054,241 EOSC shares at a price of $.47 per share, and Agira Trading, of the British Virgin Islands, also invested $500,000 for an identical number of shares at the same price per share. There is no evidence that these Regulation S shares have been sold since they were issued. Milestone was paid $100,000 by EOSC and $30,000 by the investors for these Regulation S offerings.

The December 23 8–K describes the bridge loan as follows:

> [P]rior to Closing, WTS shall have caused the bridge loan in the amount of $500,000 to be converted to common stock of WTS or an additional 500,000 to be invested as equity, and further shall cause immediately following Closing to have an additional $500,000 to be invested and infused into Curbstone.

The "Material Liabilities of WTS" listed in the 8–K include "a bridge loan in the amount of $500,000 from Optimum Fund." There was no other description of the Regulation S transactions or the bridge loan in the December 23 8–K.

### 3. Levy finds Curbstone and structures the acquisition.

In November 1997, Levy selected Curbstone as the WTS merger partner. Levy had met Curbstone's Chachas earlier in 1997, when they were on opposite sides of another transaction in which an operating company represented by Levy merged into a shell owned by Chachas and Brooksbank. By late November, the Curbstone Management, that is its four principal shareholders, had agreed to pursue the transaction. Levy negotiated the terms of the transaction with Chachas, who kept the other three principal shareholders advised of the progress of the talks.

Chachas prepared a draft exchange agreement by marking up the agreement that Levy had used in the prior transaction in which Levy and Chachas had both been involved. According to the terms of the agreement, upon closing the Curbstone shareholders would hold no more than 5% of the fully diluted stock of the new company, i.e., 925,217 shares. The balance of the 3,521,876 shares of Curbstone would be cancelled. All of the WTS shares would be exchanged for 17,547,475 newly issued shares of Curbstone. This would allow WTS management to control the company, and give the Curbstone shareholders an investment opportunity in a company with an operating business. It was also agreed that the officers and directors of Curbstone would all resign and be replaced by WTS personnel. A November 25 draft Acquisition Agreement reflects these terms. This structure resembles the understanding between Weaver and Milestone reflected in the November 13 Letter of Intent, that is, that WTS would give up no more that 5% of its stock for a merger into a shell.

From the beginning of the negotiations, Chachas envisioned two separate payments to the Management Shareholders for their agreement to participate in the merger. As reflected in a document that he drafted in late November, he expected that the four Management Shareholders would receive $125,000 in cash and would be paid $1.2 million by "market makers" for 300,000 of their shares in the new company, priced in

three equal units at between $3 per share to $5 per share.[12]

By December 1, Chachas was requesting $125,000 in cash at the closing and $2,352 million within six weeks thereafter in return for the sale by the Curbstone Management of a majority of their shares in the new company.[13] On December 2, 1997, Chachas sent Levy what he characterized as "the only two acceptable alternatives" for closing and "our best and final effort." Under the first alternative, the Curbstone Management would be paid (1) $125,000 in cash at a closing on December 5, and (2) an additional $2,352 million in four installments between December 16, 1997, and March 13, 1998. The latter payment purchased 542,000 shares belonging to Curbstone Management. To insure performance by the purchasers, the Curbstone transfer agent would not release newly issued common stock to WTS or cancel the 2,596,659 shares of Curbstone common stock due to be cancelled until the first installment payment of $450,000 had been received, which was due no later than December 16. The second alternative contemplated an immediate payment of a "$10,000 no [sic] refundable deposit," as well as a December 16 closing, with the $125,000 in cash and first installment payment of $450,000 due at that time. The remainder of the 542,000 shares

would be available for purchase in three installments spanning the time between December 16 and March 13, 1998. Under both proposals there would be no change in the Curbstone transfer agent until March 15, 1998, or until all the 542,000 shares had been acquired, whichever occurred first.

Following discussions with Levy on December 3, 1997, Chachas sent Levy a written outline of "the terms for the closing of the Curbstone/WTS acquisition." The acquisition agreement would be signed on December 4 and Curbstone Management would be paid $25,000 as a non-refundable deposit. The closing would occur no later than January 16, or

> when the balance of the $125,000 is payable and the first round of 150,000 shares of Common Stock of Curbstone have [sic] been purchased from the Curbstone shareholders at a net of $3.00 per share and full payment has been received.

The remainder of the 542,000 shares would be made available for purchase in blocks of shares at monthly intervals running to April 17, on which date the final 92,000 shares would be available for purchase at $6 per share.[14] Under this agreement, the transfer agent could be changed after 30 days.[15] The

12. At the hearing, Chachas claimed that the reference to "market makers" in this document was an error attributable to Chachas' having "cut and pasted" portions of the document from prior agreements. The Court finds this explanation incredible. The pertinent section, which appeared as "Condition 8" to the merger in this document, reads as follows:

> Principals to make available 300,000 shares for purchase by market makers at:
> 100,000 @ net of $3.00
> 100,000 @ net of $4 per share; and
> 100,000 @ net of $5.00 per share.

These are almost exactly the terms of the option agreements that were incorporated into a December 1 draft agreement and ultimately agreed upon between Chachas and Levy. Instead of selling 100,000 shares in each stage, the Management Shareholders agreed to hold for sale three batches of 150,000 shares at the prices set forth above, in addition to one final batch of 92,000 shares at $6. In addition, Chachas did not claim that any of the seven other conditions listed in this document were mistakes, but acknowledged that they were all part of his understanding of the transaction at that moment in time.

13. Chachas proposed that the Curbstone Management make available 400,000 shares of the principal shareholders, and 142,000 shares belonging to Dillon Trading, a company owned solely by Chachas and Brooksbank, to be bought in four blocks at prices ranging from $3 per share to $6 per share. Chachas also proposed that the merger close by December 3, that 300,000 of the shares be purchased no later than December 19, and that the remaining 242,000 shares be purchased no later than January 15.

14. The letter also committed the Curbstone Management to locking up 200,000 shares until March 15.

15. The defendants have explained the references in the above-described documents to the Curbstone transfer agent—specifically the amount of time he would be retained as the new company's transfer agent—as a condition imposed by Chachas in order to give Day an opportunity to prove his worth to the new management team. Any fair reading of these documents, however, indicates that Chachas planned to use his control over the transfer agent as leverage to ensure that Milestone and Levy lived up to their commit-

latter sales of 392,000 shares are in the nature of a call option agreement, with the Curbstone Management having no direct control over the exercise of the options.

Over December 2 and 3, Chachas and Levy finally agreed on the following payments to Curbstone Management in exchange for their agreement to acquire WTS:

1) a $25,000 non-refundable payment, which Levy sent to Chachas on December 8;

2) a $100,000 payment for the sale of 2,563,000 Curbstone Management Shares described below, which payment Levy sent to Chachas on December 12;

3) the purchase of 150,000 Curbstone Management Shares for $450,000, or $3 per share, for which payment was made on December 12;

4) An oral agreement that Milestone had an option to purchase in the following three rounds the following Curbstone Management Shares: 150,000 shares at $4 per share by February 13, 1998; 150,000 shares at $5 per share by March 13, 1998; and 92,000 shares at $6 per share by April 17, 1998.

As this list indicates, Chachas, Cavanagh, and Levy decided that the vast majority of the Curbstone Management Shares would not be cancelled. Instead, they arranged a sale for $100,000 of 2,563,000 of the shares that had been slated for cancellation. Although Chachas at first understood that the

shares were to be transferred to Milestone, he was later informed that the certificates for the shares were to be issued in the names of three Spanish clients of Milestone ("the Spanish Shares"). Although Chachas presents this arrangement simply as a means by which Curbstone Management could get $100,000 for shares that otherwise would have been cancelled, this critical decision substantially changed the entire transaction, and was essential to the fraud. It afforded Milestone, and those associated with it, the means to profit enormously from the fraud while giving absolutely nothing of value to WTS. Indeed, the arrangement radically transformed the terms of the merger, in that it would no longer be true that all but 5% of the shares of the new entity would be traded for WTS stock.[16] As a result of the decision not to cancel over 2.5 million of the Management Shares, not 5%, but approximately 16% of the EOSC stock was held by Curbstone shareholders or those to whom they sold. In any event, both Milestone and Curbstone Management now had a strong motive to create a market price for the new entity that would allow them to sell the shares covered by the call option agreement and the Spanish Shares for a significant profit. As Brooksbank frankly recognized at the hearing with respect to the option agreements, "if we were going to make any money [out of the merger] this was where it was going to happen." On December 5, Levy sent Chachas by telefax a

---

ments to him. Chachas had confidence that Day, with whom he had a long-standing and close working relationship, would comply with any order he received from Chachas. Day, who testified at the hearing, exercised no independent judgment about any of the actions Chachas directed him to take, relying instead entirely on the instructions he was given by Chachas. Day stated:

I comply with instructions given to me by counsel for the company. If they said do it, I would put the affiliate legend on; and if they said don't put the legend on because they are registered, I would not put it on because they are registered. Otherwise, I would be in a position of second-guessing all of these attorneys.

Day received $20,000 from Curbstone on December 19, far in excess of his customary fees for the work he performed as a transfer agent, and had received 25,000 Curbstone shares in 1996. While Chachas and Day had explanations for

each of these payments, they nonetheless serve to demonstrate the nature of the relationship between the two men.

16. Charts prepared by Chachas during the negotiations of the acquisition all reflect his understanding that the Curbstone shareholders were, collectively, to hold no more than 5% of the EOSC stock. By his calculations, their percentage of shares under the various scenarios fluctuated between 4.3% and 5%. Similarly, the charts reflect the understanding that WTS shareholders were to hold approximately 60% of the shares; their percentage of shares fluctuates between 57.01% and 57.02%. The charts reflect the remaining shares going to Levy (3.56% to 4.73%), to investors in return for $1 million of financing (9.5% to 10%), and to the effort to raise $3 million (2.88% to 9.5%), with Milestone getting the balance, that is, between 14.25% and 22.16%. Thus, from the beginning, Chachas understood that this transaction was intended greatly to enrich both Levy and Milestone.

revision of the exchange agreement that reflected the decision that there would be no cancellation of the Curbstone Management Shares.

4. Chachas and others execute the "December 5, 1997" stock exchange agreement ("Exchange Agreement") between WTS and Curbstone.

The Exchange Agreement, which bears the date December 5 on its cover, but was executed by Chachas and Brooksbank on December 8, contains the following terms.[17] Curbstone would deliver to the WTS shareholders 15,488,120 [18] shares of authorized, but previously unissued unregistered shares of Curbstone in exchange for all of the issued and outstanding shares of WTS owned by the WTS shareholders. The Exchange Agreement included the representation that those shares given in exchange for the WTS stock had not been registered and would be issued with a restrictive legend. The Agreement further represented that the authorized capital stock of Curbstone consisted of 3,521,876 shares of stock *issued* and outstanding prior to the Closing. The Closing was to be held on or prior to January 16, 1998.

On December 5, Chachas and Brooksbank executed a corporate resolution authorizing Day to issue 17,596,601 restricted shares, which included the 15,488,120 shares described in the final Exchange Agreement as well as 2,108,481 shares divided between Agira and Optimum.[19] Of the 15,488,120 restricted shares to be issued, 500,000 shares were to be issued to Levy, and 2,108,481 were to be issued to Milestone. The certificates for all of these shares were to be delivered to Levy. In addition, the transfer agent was instructed to cancel 33,659 shares of Curbstone held by Curbstone shareholders. As a consequence of the December 5 resolution, there were 21,084,818 issued and outstanding shares of Curbstone. As described below, however, these instructions were not sent to Day until after the Curbstone Management had received $575,000 in cash.

5. The Spanish Shares move from Curbstone into the market.

Cavanagh contends that the 2,563,000 Curbstone Management Shares purchased for $100,000 were sold to three clients of Vicente Tur Ortola, an attorney whom Cavanagh had met in Spain in June 1996.[20] According to Cavanagh, Tur Ortola represents groups of investors who want to invest in U.S. publicly traded corporations. While Cavanagh contends that he told Levy in late November that some Milestone clients wanted to purchase Curbstone stock, both Levy and Cavanagh deny negotiating the terms of the transaction between Chachas and Tur Ortola. On the other hand, it is undisputed that Chachas never spoke to Tur Ortola and dealt for all practical purposes solely with Levy. In any event, I find that Cavanagh, through Levy, negotiated these sales with Chachas.

Chachas structured the sale of the Spanish Shares so that it appeared to occur on December 18, immediately after the closing of the acquisition. He fully recognized that, if

17. Chachas apparently did not supply WTS with his signature page, however, until December 18. The WTS shareholders signed between December 2 and 16.

18. Although the draft merger agreement called for Curbstone to deliver to WTS 17,547,791 shares of previously authorized but unissued stock, the final agreement that was signed reduced that number to 15,488,120.

19. The stock transfer to Agira represented a Regulation S sale of equity. The transfer to Optimum converted Optimum's earlier bridge loan for $500,000 to an equity investment, again under Regulation S, such that WTS no longer had an obligation to repay the loan.

20. The Purchase Agreements under which the Spanish Shares were sold reflect a sale of 2,563,000 shares. A sale of this number of shares is also indicated on the documents Chachas prepared during the negotiation of the acquisition transactions. Chachas instructed Day on November 18, however, to transfer only 2,353,217 to the three "Spanish entities." While Customer Safety and Construcciones each received 854,333 shares, Cambiarios received only 644,551 shares. Apparently, a fourth "Spanish entity," Inversora Dactilar, S.L., received 209,783 shares intended for Cambiarios. Inversora received 857,081 restricted shares as a result of an error in Chachas' directions to Day, instead of 647,298 shares as had been intended.

sold before the closing, these shares were indisputably "control shares." Relying on the fact that the shares had been registered initially in 1996 under an S–8, the Purchase Agreements for the sale of the Spanish Shares drafted by Chachas (there were three identical agreements except for the name of the purchaser) represented that the shares "have been registered securities and will be free of restrictive legend upon delivery." The Agreements further provided that Chachas would hold the shares until "all conditions for the Closing of the Agreement for Exchange of Stock between Curbstone and WTS ... have been satisfied ...." The Purchase Agreements also included a provision that the Curbstone Management Shareholders had the right to repurchase the shares *at the same price* for which they had sold them, in the event that the Closing of the acquisition of WTS by Curbstone was completed on or before January 16, 1998. The Purchase Agreements also contained "representation and warranties" by the purchasers, discussed at greater length below, which provided that the purchasers were accredited investors and had no present agreements to resell the shares.

Chachas provided the Purchase Agreement to Levy with blanks for the number of shares and total purchase price, the name of the purchaser and the date of purchase.[21] It appears that Levy faxed the Purchase Agreements to Milestone on December 5; that Milestone's Nicolois faxed the Agreements to "Vincent Tur" on December 10; and that three such agreements were executed on December 11 on behalf of purchasers,

and returned. Chachas contends that he signed the Agreements on December 19.

Although there are three separate agreements, each for the purchase of one-third of the Spanish Shares, it is apparent that the purchase of the entire block was controlled by a single entity.[22] Moreover, as is evident from the date on the account opening statement at Donald & Co., Cavanagh laid the groundwork for reselling these shares into the American securities market on December 11, that is, even before the shares had been paid for.[23] On December 12, Milestone sent the cash—$100,000—for purchasing the 2.563 million Spanish Shares to Chachas' escrow account from its escrow account at Levy's law firm. Thus, the Spanish Shares were purchased at a price of less than four cents per share, specifically, $.39.

In a twice-underlined instruction to Day on December 17, Chachas ordered Day to issue 2,353,217 shares to the three Spanish entities "without legend." On December 18, 1997, the stock certificates were issued and sent to Levy. Chachas understood that it was important to both Levy and Cavanagh that any shares sent to Milestone or its clients be unlegended shares. In documents prepared by Chachas as early as November, Chachas indicated to Levy that 3,510,027 of the 3,521,876 issued Curbstone shares were "free trading" shares. Chachas was acutely aware that there were severe restrictions on the sale of Curbstone Management Shares if sold by affiliates or persons in control of Curbstone. According to Chachas, so long as the Curbstone Management Shares were sold *after* the acquisition, and thus after the four Curbstone Management Shareholders were

21. Chachas had originally been told that Milestone would purchase all of the shares. Cavanagh later decided to split the transaction into three units, so that no one purchaser would own over 5% of the EOSC stock, apparently to avoid triggering the reporting requirements under Section 13D of the Exchange Act. Section 13D provides that any person who acquires beneficial ownership of more than 5% of a class of stock in a company must make timely disclosures to the issuer of the stock, the exchange on which the stock is listed, and the SEC. *See* 15 U.S.C. § 78m(d).

22. The Purchase Agreements, each of which bears the date December 1, 1997, were executed

as follows: (1) by Vincente Tur Otola of Alciante, Spain, a Director of Cambiarios S.L., (2) by Benjamin Pineda Lioret, the Director of Customer Safety, S.L. of Alciante, Spain, and (3) by Mr. Lioret on behalf of Construcciones Solariegas, S.L. An account opening form for Cambiarios, at Donald & Co., is dated December 11, 1997. The Donald & Co. new account form for Customer Safety reflects the same fax number, business phone number, and bank reference as the form for Cambiarios.

23. Cavanagh admits recommending to Tur Otola that his clients open trading accounts at Donald & Co. with Tacopino; copies of the account opening documents were kept at Milestone.

no longer affiliates or in control of the corporation's operations, the stock could be sold without any restrictions on its being traded in United States securities markets. Among the steps Chachas took to make it appear that the sale of Spanish Shares did occur after the acquisition, were (1) inserting language in the Purchase Agreement making the delivery of the shares contingent on the acquisition; (2) holding the $100,000 paid for the shares in an escrow account until after the acquisition; (3) executing virtually all of the documents associated with the acquisition prior to sending instructions to Day to transfer the Spanish Shares; and (4) issuing instructions to Day directing him to issue the unregistered Curbstone shares to WTS (which were exchanged for the WTS shares and thus effected the merger) prior to transferring the 2,353,217 Curbstone Management Shares to the three Spanish entities.[24]

Levy was fully familiar with Chachas' rationalization that taking the above-described steps would justify the sale of the Curbstone Management Shares without any legend restricting their resale. He testified at the hearing that he conveyed to Cavanagh Chachas' own legal conclusion that the Spanish Shares were "free trading" shares, as well as his concurrence in that judgment. Cavanagh in turn contends that he was entitled to and did rely upon Levy's legal opinion that the Spanish Shares were free trading shares. In any event, all three men knew that the purchase of unlegended Spanish Shares was an essential part of the acquisition of WTS by Curbstone, and that at the time those shares were committed to be sold, and were paid for, they were owned by men who controlled the decision as to whether Curbstone would acquire WTS.[25]

Between December 24 and 26, the Spanish Shares as well as other EOSC shares were deposited into trading accounts at Donald & Co. The 2,713,000 shares so deposited constituted at least 77% of the "market float," that is, 77% of the 3,521,876 shares that were available for trading in the public market. Beginning in late December 1997, Tacopino began systematically liquidating these shares.[26] When these shares are combined

---

**24.** Chachas contends, and for purposes of this hearing I accept, that his December 18 written instructions to Day were intended to and did result in Day issuing the unregistered stock to WTS prior to transferring the already issued Curbstone Management Shares to the three Spanish entities. The instructions to Day "with regard to the Closing of the Acquisition of WTS Transnational by Curbstone" included four numbered items: (1) the issuance of 17,596,601 shares; (2) the cancellation of certain shares pursuant to the requirements of the Exchange Agreement; (3) the transfer of 2,563,000 shares; and (4) a request to forward an updated shareholders list. Although there was no explicit instruction to do so, Day testified that he understood that Chachas wanted him to do each task in the exact order listed and that he followed those instructions.

**25.** Brooksbank, who was constantly in touch with Chachas about the acquisition and was fully informed of its terms, also understood, from Chachas, that it would be illegal to sell the Curbstone Management Shares before the merger was completed.

**26.** 1,004,334 Curbstone/EOSC shares were deposited into the Cambiarios account between December 24 and 26, 1997. These shares apparently include the 644,551 shares sold to Cambiarios under the Purchase Agreement as well as the 150,000 shares sold under the Option Agreement.

The source of the remaining 209,783 shares is unclear, but may very well be the 209,783 shares of restricted stock issued in error to Inversora Dactilar. Between December 29 and 31, 102,100 shares were sold for $555,260.07. In January, 724,900 EOSC shares were sold for $3,775,704.03. By the end of the month, only 177,334 shares remained in the account. If the 209,783 shares were restricted Inversora stock, then the January sales from this account included the sales of restricted stock. Before January 14, there was systematic selling of approximately 10,000 to 40,000 shares on almost every trading day. Starting on January 14, two days after the Future Superstock story discussed below was released, the number of shares sold on an almost daily basis increased dramatically.

854,333 EOSC shares were deposited into the Construcciones account on December 26. With the exception of a transfer of 3,000 shares on January 21, 1998, there was no other account activity of moment through the end of January.

854,333 EOSC shares were deposited into the Customer Safety account on December 26. Beginning on January 5, 1998, all but 90,333 of those shares were transferred during January by Cavanagh to his family, friends, and associates. Cavanagh contends that he asked Customer Safety if he could repurchase the 854,333 shares it had just bought for $.039 per share and that it agreed. At his March 21, 1998, deposition, Cavanagh testified that he had executed a promisso-

with the remaining 392,000 shares tied up by the Option Agreement and the 200,000 shares held by Curbstone Management under a lock-up agreement, Cavanagh controlled approximately 95% of the market float prior to liquidation.

6. The acquisition is completed.

On December 12, Levy wire transferred to Chachas $550,000, representing the $100,000 payment for the purchase of the 2,563,000 Spanish Shares and $450,000 for Milestone's exercise of the first round of options to purchase 150,000 shares. In connection with that first amount of money, Levy wrote that the $100,00 was wired *"to complete* the sale of 2,563,000 shares as of December 1, 1997," (emphasis added) the date Chachas had inserted into the agreement to purchase the Spanish shares. Chachas distributed the $550,000 among the four Management Shareholders on December 19. Chachas tendered his resignation as an officer and director of Curbstone on December 12 and wrote to Levy:

> It is my understanding that the agreement between Curbstone and WTS has been fully executed and thus this transaction is closed .... As I indicated previously I will be glad to edgarize [27] and file the 8–K if you need my assistance.

On December 16, 1997, Milestone signed the agreement dated November 20, 1997, that Weiss and Friedman—who had introduced Milestone to WTS—had sent to Milestone on November 21, 1997. Pursuant to this document, Milestone agreed to convey 150,000 shares of EOSC to the two individuals as full payment for their consulting services.

During this period of time, Chachas obtained a CUSIP number for the new company and was notified that the company would bear the OTC trading symbol of EOSC. On December 16, he confirmed with Levy the appropriate division among the three Spanish entities of the "2,563,000 Free trading [shares] purchased for $100,000." On December 17, 1997, Chachas sent by overnight mail instructions to Day to issue new stock and to cancel and transfer existing stock.

On December 18, Chachas and Brooksbank, acting as the "entire Board of Directors," executed a corporate resolution appointing four WTS employees as directors, accepting their own resignations as officers, and appointing in their stead five WTS employees as officers. On that same day, Day acted on the instructions that Chachas had sent him, completing both the acquisition and the sale of the Spanish Shares.

7. December 19, 1997 trading moves the EOSC stock price to over $5 per share.

On December 19, at about 10:22 a.m., before there had been any public announcement of the acquisition, Cavanagh called Proudian, a trader at Alexander, Wescott & Co., and told him to buy 500 shares of EOSC at $7 per share for his client, Optimum Fund.[28] Proudian called Donald & Co, placed

ry note to purchase the shares at a price of $3 per share, or $2,562,999. The note had not been produced in discovery. That same day, Vincent Tur Ortola telefaxed two promissory notes to Milestone in the sums of $553,000 and $525,000. The notes, which require payment on demand and carry an interest rate of 7%, bear the printed date of December 23, 1997. They make no reference to EOSC shares. Cavanagh testified at the hearing that no demand, and no payment, has been made on the notes.

27. "Edgar" is the SEC's system of electronic filing.

28. While Proudian and Cavanagh both describe this order as a "limit order," meaning that Proudian was authorized to buy the stock for Cavanagh at any price up to $7, Proudian understood, and Cavanagh expected based on his extensive prior experience with Proudian, that Proudian would attempt to buy the stock at $7 and not at a lower price. Indeed, the conversation between Proudian and Cavanagh left no doubt that Cavanagh was requesting that the stock be purchased at $7. Defense counsel repeatedly cross-examined Proudian about this portion of his testimony, resulting in some confusion as to what exactly was said during the 30–second conversation between the broker and Cavanagh. Nevertheless, Proudian's testimony revealed that, when Cavanagh first placed the $7 order, Proudian questioned or "rebutted" that order by informing Cavanagh that the stock was trading considerably lower than that price. When Proudian rebutted the order, Proudian testified that Cavanagh "reiterated his initial statement, go to the market and buy the stock at $7 a share." Consequently, Proudian did just that.

the order, and made the trade. A trade at $7 per share reflected a market capitalization for EOSC of $140,000,000. As recently as November, the President of WTS labelled a market capitalization of $53 million after the investment of $4 million (which WTS had yet to receive) "astronomical."

The last trade before this $7 purchase of stock had, of course, occurred before the acquisition that had fundamentally changed the nature of the company. It occurred on November 12, 1997, when the stock had traded around 20 cents per share. Prior to Cavanagh's purchase, the December 19 market maker quotes for the stock were $.50 bid for 5,000 shares and no offer, that is, the market maker would pay $.50 for the stock and was not quoting a price at which it would sell the stock.[29] After Cavanagh's purchase, Donald & Co. immediately changed its market maker quotes to $5 bid for 500 shares and $7 ask. Within minutes a second market maker followed suit.

The second trade in EOSC occurred at 10:53 a.m., when 3,000 shares were purchased at $5.50 per share through a Canadian broker-dealer for the account of Banca del Gottard, Zurich, Switzerland. Jean–Pierre Neuhaus, a Milestone client, who has signatory power over the account that placed the order, soon received 50,000 EOSC shares from Cavanagh out of the Customer Safety account.

Cavanagh orchestrated another purchase of EOSC stock on behalf of Optimum Fund at 11:13 a.m. This time Cavanagh placed a market order for 2,500 shares, which was filled at $5,375. Cavanagh contends that Stieghorst of Optimum Fund was enthusiastic about the stock and wished to own some.[30]

Chachas then placed the fourth and final retail trade of the day: a market order for 100 EOSC shares at 2:10 p.m. The order was filled at $5 ⅞.[31]

The effect of Cavanagh's first trade was to shift the market maker quotes for the EOSC stock. The cumulative effect of these four trades was to set a price for EOSC stock at over $5 per share prior to the public announcement of the acquisition, which occurred at 6:17 p.m. that day. Cavanagh and Chachas each had a substantial motive to move the price of the EOSC stock as high as possible in order to maximize their profits from the sales of Management Shares that they would be making in succeeding weeks. I find that both Cavanagh and Chachas placed their orders with the intent to help establish a market price for EOSC at or above $5 per share.[32]

After the close of business on December 19, Curbstone announced the acquisition, which was reported on the business wire. The terms of the acquisition were reported as follows:

> Curbstone Acquisition Corp., a public company, Friday announced that it had completed the acquisition of 100 percent of the stock of WTS Transnational Corp., a pri-

---

**29.** The market maker quote came from Donald & Co., which had not acted as a market maker in this stock until December 19.

**30.** It is ironic, to say the least, that Cavanagh did not advise Stieghorst that millions of shares of EOSC had just been purchased at less than four cents a share by the Spanish entities, who had already opened trading accounts at Donald & Co., and that the shares might be available to Stieghorst for considerably less money.

**31.** This was the second market price purchase of stock that Chachas had made in an internet trading account that he had opened in November 1997 on behalf of himself and Brooksbank for their firm, Dillon Trading, with a company called "E–Trade."

**32.** Chachas contends that he was tinkering with his internet trading system and had not checked the market before placing this order. While this is a difficult question to resolve, I believe that the SEC has succeeded in showing that this explanation is not credible. In reaching this conclusion, I find it particularly persuasive that Chachas had to realize that it was illegal for him to trade in Curbstone stock while in possession of material non-public information about the company. There had been no public announcement of the acquisition at the time that he placed his order, and he did not file the 8–K disclosing the transaction until December 23. Moreover, as described at some length below, the SEC has also met its burden for the purposes of this preliminary injunction hearing of showing that Chachas was a willing and knowledgeable participant in a scheme to defraud, of which this effort to establish a benchmark for the market price of EOSC shares was a crucial component.

vately held company, in exchange for the original issuance of 15,488,120 shares of Curbstone common stock.[33] Curbstone has changed its name to Electro–Optical Systems Corp. The Bulletin Board symbol has been changed to "EOSC." The directors and officers of Curbstone have resigned and have elected the directors and officers of WTS to succeed them.

8. Chachas prepares the December 23, 1997 Form 8–K.

At the request of Levy, Chachas prepared the Curbstone Form 8–K,[34] filed on December 23, 1997. According to Chachas, he prepared the 8–K as an accommodation to EOSC, because he knew how to do electronic filing with the SEC (through the Edgar system), and, since the Christmas holidays were approaching, it would have been difficult for the company to find someone else to prepare the filing on short notice.

The 8–K provided the public with its most extensive information to date about WTS and the terms of the Curbstone/WTS merger. It included a copy of the Exchange Agreement, but did not disclose the sale of the Spanish Shares, the option agreement, the transfer of restricted stock to Milestone,[35] or the transfer of restricted stock to Levy. The 8–K indicated, as discussed above, that WTS had received a bridge loan in the amount of $500,000 that was to be converted into equity, and that an additional $500,000 was to be invested in Curbstone immediately after the closing. It did not disclose, however, that Regulation S stock had already been issued in connection with this $1 million investment.

The 8–K indicated that a total of 19,009,996 shares of Curbstone/EOSC stock would be outstanding after the closing. That figure includes the 3,521,876 shares that were represented as issued and outstanding prior to the closing, and the 15,488,120 shares that were represented as being newly issued to WTS. It did not indicate what the architects of the transaction already knew—namely, that the total number of outstanding shares was actually closer to 21 million shares. The additional 2.1 million shares had been issued to Agira and Optimum under Regulation S concurrently with the closing.

The 8–K was amended by a filing that EOSC made on February 18, 1998.[36] This filing disclosed the Regulation S sales to Agira and Optimum. It also indicated that the total number of shares outstanding was 21,084,818.[37] The amended 8–K did not, however, cure all of the deficiencies in the December 23 filing. Because the amended 8–K was not the focus of the preliminary injunction hearing, the Court will note only a few brief observations about its failings.

Most importantly, it continued to portray the WTS–Curbstone merger as a stock-for-stock transaction, without disclosing the considerable additional terms of the deal that have been set forth in this Opinion. It also continued to represent, as had the December 23 8–K, that the 15,488,120 shares of Curbstone stock that were issued at the time of

---

**33.** This was a materially false description of the terms of the acquisition. The record appears to be silent as to the author of this release.

**34.** An 8–K form is required to be filed upon the occurrence of certain enumerated events in the life of a registered company, including a change in control. *See* Form 8–K [1996–1997 Transfer Binder] Fed. Sec. L. Rep. (CCH) ¶ 31,002 *et seq.*

**35.** The 8–K also explicitly represented that no broker was associated with the transaction and that no fee had been paid to a broker. In light of the extensive payments in stock and cash that were made to Cavanagh, this statement was plainly false, whether or not Cavanagh characterized himself as a "broker."

**36.** The record is not clear as to who prepared this filing for EOSC. At the hearing, the defendants argued that the Regulation S sales effected

on December 19 did not need to be reported in the December 23 8–K because there is a 15 day window before which such sales need not be reported. That date, January 3, 1998, passed without any filing though. In any event, there was a duty to report the Regulation S sales in the December 23 8–K. Because of their omission, the December 23 8–K contained false and misleading information.

**37.** The amended 8–K indicated that the total number of Curbstone shares that were outstanding at the time of the merger was 3,488,217 rather than the 3,521,876 indicated in the signed acquisition agreement and the December 8–K. No explanation has ever been given for this discrepancy.

the acquisition went directly to WTS shareholders. In fact, according to the transfer agent's records, only 12,022,558 of those shares went to WTS shareholders. 500,000 shares went directly to Levy, and 2,108,481 shares went directly to Milestone. An additional 857,081 shares went to Inversora Dactilar, S.L., the Spanish entity that Cavanagh indicated he had lined up to provide additional financing for EOSC. Finally, the amended 8–K indicated that, to the knowledge of EOSC management, no agreements as to any matters existed amongst the former shareholders and any other shareholders of EOSC. Although it may have been true that EOSC management did not know about the side agreements arranged by Cavanagh, Levy, and Chachas, these agreements certainly did exist and EOSC's attorney, Levy, was their primary architect.[38]

9. The Future Superstock picks EOSC.

On January 12, 1998, an internet publication called The Future Superstock released to its subscribers its choice as the "Stock Pick of the Year for 1998"—EOSC. It observed, after a lengthy discussion of the company's product plans, that The Future Superstock had set "a price target" of $15 to $18 per share for the EOSC stock over the next three months to a year. Among the data the publication relied upon in making its assessment of the company was its trading history, which was described as having begun on December 19, 1997, and having included a high of $7 per share and a low of $5 per share. On January 24, 1998, this article was publicly released. During the mid-January period, Cavanagh stepped up the pace of his liquidation of EOSC shares and the volume of trading in EOSC stock soared. Lehman,[39] the man responsible for introducing Cav-

anagh to WTS, was responsible for introducing Bruss, Future Superstock's owner, to EOSC. Bruss, who testified at the hearing, explained that his investigation of EOSC included studying the EOSC trading history, interviewing its management, and looking at its business plan.

Bruss' prediction that EOSC stock would be trading at $18 per share by the end of the year was extraordinary. That prediction assumed a market capitalization of $378,000,000 for a company that had not yet received even a full $1 million from outside investors and that, as explained below, had not even successfully produced a prototype to show to potential customers. Indeed, on the very day that Bruss first released his article, January 12, EOSC's Weaver was writing an internal memo about "hype," acknowledging that he would rather not say anything until EOSC had a product on the street. According to Weaver, "We do not have a product that we can show today. We will in about four months."

10. The January 30 EOSC press release falsely describes EOSC's state of production.

By January 30, however, EOSC abandoned any reticence it had about issuing press releases. It issued a release conveying that EOSC was already selling its new product to a company called ADL Data Systems, Inc. ("ADL"). The release of this statement to the press was orchestrated by Levy and Friedman, one of those responsible for introducing WTS to Cavanagh in the summer of 1997. In late January 1998, Friedman,[40] who also was a client of ADL, suggested to ADL's President David Pollack that Pollack might want to look at, and get distribution rights

---

**38.** The amended 8–K also contained a number of misleading statements about the status of EOSC's product. Namely, EOSC represented that

[t]he Company *has developed and is in the process of commencing production* of fingerprint biometric systems for the information security and access control market segments. *After final field testing is completed,* the Company *presently expects to initiate its first commercial shipment of product in the third quarter* . . . .

(Emphasis added).

**39.** Lehman's wife, Tamar, received 100,000 shares of unlegended EOSC stock from Cavanagh in January 1998. The record suggests that an additional 50,000 shares were also transferred to her—constituting at total of 150,000 shares—but these additional shares do not appear in her Donald & Co. account records. At present, the SEC has confined its allegations concerning the Lehmans to the initial 100,000 shares.

**40.** Friedman received 75,000 unlegended EOSC shares from Cavanagh in January 1998.

to, EOSC's fingerprint identification unit. Pollack contacted Weaver and began discussions about the fingerprint technology. Shortly thereafter, on January 30, Levy sent a draft letter to Pollack describing an agreement between the two companies. Pollack revised the draft letter to EOSC and sent it to Weaver. Pollack specifically told Levy that the letter was not a purchase order, and that he couldn't purchase what he hadn't evaluated.

Both Pollack and Weaver signed the letter, which concerns a "Proposed Joint Venture." It reads in pertinent part as follows:

"[A]s per my negotiations with your agent, enclosed please find our Purchase Order for 1,000 units of your Fingerprint Identification System. These units are to be delivered to our office soon after we've had the opportunity to test your evaluation units and the price will be finalized prior to shipment .... [Assuming the success of a field test,] we both agree to enter into a Joint Venture to market on an exclusive basis these units in the nursing home, long term care facilities, and adult homes and on a non exclusive basis home care agencies ...." [41]

No Purchase Order was attached to the letter.

At the same time that Levy was drafting the letter exchanged between the two CEOs, he was busy drafting a press release for simultaneous distribution. In doing so, he telefaxed copies of his *drafts* of the press release to Lehman, his colleague Michelle Weiss,[42] and Future Superstock's Bruss.[43] The January 30, 1998 press release issued by EOSC reads in pertinent part as follows:

ELECTRO–OPTICAL SYSTEMS CORP. (OTC–Bulletin Board: EOSC) a public company, announced today that it received a Purchase Order from ADL Data Systems, Inc., a leading system integrator and software provider to the nursing home and health care industry, for an initial order of 1,000 Finger Print Verification Units for an undisclosed price. The Purchase Order and accompanying Letter of Agreement state that upon the successful evaluation and testing of these units initially with selected ADL nursing home clients, ADL agrees to market additional units in a joint venture with EOSC to national health care sources. ADL estimates that the first year of the joint venture following the test placement could result in the sale of a minimum of 15,000 units.

The false statements in this press release included the representation that EOSC had received an initial order for 1,000 units from ADL. Levy and other defendants have tried to justify this false statement by testifying that there is an industry practice of "conditional" orders that are subject to the customer's approval of the product and confirmation. The press release does not describe such an arrangement, however, and the evidence is strong that both Levy and Weaver knowingly participated in the dissemination of this false information to the public.

This is perhaps an appropriate point at which to describe in greater detail the technology that EOSC was in the process of developing in January. During the April hearing, the EOSC fingerprint identification technology was demonstrated in court using a computer "mouse" and computer terminal. In the demonstrations, a person was "enrolled" in the list of those granted access to the computer's files by having the person place her thumb on a pad on the mouse three times to permit three different impressions of the person's thumbprint to be taken. Once enrolled, an enrollee is supposed to have her thumbprint read and recognized by placing her thumb on the mouse's pad again. This entire process was demonstrated with three different new enrollees. The demonstrations underscored how sensitive the

---

**41.** In answer to an e-mail inquiry of March 11, 1998, Pollack wrote regarding EOSC:
We have not been able to evaluate the units as of yet. The only insight I can provide is that a low cost device with the described capability should be very successful. Whether they can deliver a device that is easy to install and works well reamins [sic] to be seen.

**42.** Weiss also received 75,000 unlegended EOSC shares from Cavanagh in January 1998.

**43.** There were four drafts of the press release. Drafts were also faxed to Weaver, Pollack, and an Allen Lloyd. Levy testified that he received comments from at least Pollack and Weaver.

placement of the individual's thumb on the mouse's pad is. Thus, there was some difficulty getting a good quality print to enroll a person and some difficulty have the computer identify an enrolled person. The technology appears to hold great promise, but clearly remains in the development stage.

The devices on which the process was demonstrated to the Court were not those intended for ADL. EOSC was creating a miniaturized version of the technology for ADL, among other potential customers, and had hoped to have a prototype manufactured by June or July 1998 to hand to prospective customers so that orders could be solicited. The point at which that prototype could be handed to customers would mark the end of the development stage for the product. As of January 30, ADL did not even have mechanical drawings for the prototype. If EOSC had successfully created a prototype to give to ADL and prospective customers by June or July, and had the customers wanted to order the product, EOSC could have been manufacturing it in significant quantities by the end of 1998. While EOSC may yet create a viable product, it has not yet done so and its development of the product was nowhere near the level of completion that was represented in the January 30 press release.

## II. *CONCLUSIONS OF LAW*

### A. *Jurisdiction*

The Court has subject matter jurisdiction over this matter pursuant to Sections 20(d)(1) and 22(a) of the Securities Act, 15 U.S.C. §§ 77t(d)(1) and 77v(a), and Section 21(d)(3)(A), 21(e) and 27 of the Exchange Act, 15 U.S.C. §§ 78u(d)(3)(A), 78u(e) and 78aa. The Court has personal jurisdiction over all of the defendants and relief defendants under Section 27 of the Exchange Act, 15 U.S.C. § 78aa. *See SEC v. Unifund SAL,*

910 F.2d 1028, 1033 (2d Cir.1990); *Bersch v. Drexel Firestone Inc.,* 519 F.2d 974, 998 (2d Cir.1975); *Leasco Data Processing Equipment Corp. v. Maxwell,* 468 F.2d 1326, 1339–40 (2d Cir.1972). Venue is proper in the Southern District of New York pursuant to Section 22(a) of the Securities Act, 15 U.S.C. § 77v(a), and Section 27 of the Exchange Act, 15 U.S.C. § 78aa.

### B. *Standards for Granting a Preliminary Injunction with SEC as Plaintiff*

██ Section 21(d) of the Exchange Act provides, in pertinent part:

> Whenever it shall appear to the Commission that any person is engaged or is about to engage in acts or practices constituting a violation of any provisions of this chapter [or] the rule or regulations thereunder ... it may in its discretion bring an action in the proper district court ... to enjoin such acts or practices, and *upon a proper showing* a permanent or temporary injunction or restraining order shall be granted without bond.

15 U.S.C. § 78u(d) (emphasis supplied). Thus, to grant a preliminary injunction upon the SEC's request, the Court must find that the SEC has made a "proper showing" of actions by the defendants that violate their statutory obligations. *See Unifund SAL,* 910 F.2d at 1035. In this Circuit, the SEC, unlike a private litigant, need not show risk of irreparable injury to obtain an injunction, nor the unavailability of remedies at law. *Id.* at 1036.[44]

In *Unifund SAL,* the Second Circuit held that the "proper showing" required of the SEC is analogous to the traditional "likelihood of success" standard regularly applied to private litigants. *See id.* at 1037. The SEC's burden of proof varies, however, de-

---

44. Chachas cites *Tom Doherty Assocs. v. Saban Entertainment, Inc.,* 60 F.3d 27, 38 (2d Cir.1995), for the proposition that the SEC must demonstrate a "clear showing" rather than a "proper showing" of entitlement to injunctive relief. This case, and the "clear showing" standard it articulates, are inapposite. In *Doherty Assocs.,* a private litigant sought a preliminary injunction against a producer and distributor of children's books for breach of contract. In that context,

the Second Circuit held that the plaintiff had to meet the "clear showing" standard, which "incorporates the primary requirements of irreparable injury ...." *Id.* The Court further stated, "[w]e expect the 'clear showing' standard to be infrequently met," *id.,* although it found that it had been met in that case. Here, the SEC, unlike a private litigant, need not demonstrate irreparable injury, and the appropriate standard therefore is a "proper showing."

pending upon the nature of the preliminary relief the Commission seeks. Thus,

> a more substantial showing of likelihood of success, both as to violation and risk of recurrence [is required] whenever the relief sought is more than preservation of the status quo. Like any litigant, the Commission [is] obliged to make a more persuasive showing of its entitlement to a preliminary injunction the more onerous are the burdens of the injunction it seeks.

*Id.* at 1039.

The SEC seeks various forms of preliminary relief predicated on an extension of the individual measures embodied in the March 13 Order, namely: (1) a preliminary injunction enjoining the defendants from future violations of the securities laws; (2) an asset freeze; (3) an accounting of the defendants' assets; (4) the repatriation of all monies associated with trades by the defendants in EOSC stock; and (5) a freeze on any further trading by the defendants and relief defendants in EOSC stock. An injunction against future securities violations is among the sanctions noted by the Second Circuit in *Unifund SAL* as having "grave consequences." 910 F.2d at 1040. The consequences of such an injunction are grave for individuals who are regularly involved in the securities industry, like many of the defendants in this action, because the injunction places them in danger of contempt charges in all future securities transactions. *Id.* The reputational and economic harm of suffering a preliminary injunction, especially on charges of fraud, is also severe for individuals who make their living in the securities industry, such as Chachas, Levy, and Cavanagh. These individuals stand to lose considerable business and respect in their communities if even a preliminary injunction is entered.

Accordingly, to obtain this relief, the SEC must make a substantial showing of likelihood of success as to both a current violation and the risk of repetition. *Id.* In this litigation, the SEC alleges that the defendants engaged in a scheme that violated three distinct portions of the securities laws: Section 5 of the Securities Act, which prohibits the sale of unregistered securities; Section 17(a) of the Securities Act, which generally prohibits fraud in the offer or sale of securities; and Section 10(b) of the Exchange Act, which prohibits manipulative and deceptive devices in connection with the purchase or sale of securities. This Opinion will discuss these theories of relief in turn.

### C. *Claims Under Section 5*

#### 1. The Sale of the Management Shares

Section 5 provides, in pertinent part:

> *Unless a registration statement is in effect as to a security, it shall be unlawful for any person,* directly or indirectly—
>
> (1) to make use of any means or instruments of transportation or communication in interstate commerce or of the mails *to sell such security* through the use or medium of any prospectus or otherwise; or
>
> (2) to carry or cause to be carried through the mails or in interstate commerce, by any means or instruments of transportation, any such security for the purpose of sale or for delivery after sale.

15 U.S.C. § 77e(a) (emphasis added). It is undisputed that the purpose of Section 5, consistent with the overall purpose of the Securities Act, is to "protect investors by promoting full disclosure of information thought necessary to informed investment decisions." *SEC v. Harwyn Indus.*, 326 F.Supp. 943, 953 (S.D.N.Y.1971) (quoting *SEC v. Ralston Purina Co.*, 346 U.S. 119, 124, 73 S.Ct. 981, 97 L.Ed. 1494 (1953)).

The Securities Act sets forth the types of information that must be included in a registration statement. For example, information about the issuer's financial condition, the identity and background of management, and the price and amount of securities to be offered must be included in the registration statement. *See* 15 U.S.C. §§ 77g and 77aa. *See also SEC v. Manor Nursing Ctrs., Inc.*, 458 F.2d 1082, 1098 (2d Cir.1972) (discussing information to be included in a registration statement and prospectus delivered to prospective purchasers); *Harwyn Indus.*, 326 F.Supp. at 953 (discussing the significance of registration to prospective purchasers).

To establish a prima facie case for a Section 5 violation, a plaintiff must prove three elements: first, that no registration statement was in effect as to the securities; second, that the defendant sold or offered to sell these securities; third, that there was a use of interstate transportation, or communication, or of the mails in connection with the sale or offer of sale. *See Neuwirth Investment Fund, Ltd. v. Swanton,* 422 F.Supp. 1187, 1193 n. 8 (S.D.N.Y.1975) (quoting *Hill York Corp. v. American Int'l Franchises, Inc.,* 448 F.2d 680, 686 (5th Cir.1971)). To prove a violation of Section 5, a plaintiff need not establish scienter. *See SEC v. Universal Major Indus.,* 546 F.2d 1044, 1047 (2d Cir. 1976); *SEC v. Softpoint, Inc.,* 958 F.Supp. 846, 859–60 (S.D.N.Y.1997) (Sotomayor, J.).

Here, it is not seriously disputed that the SEC has made out a prima facie case for a violation of Section 5.[45] The main transaction at issue with respect to the Section 5 claim consists of the sale of 2,563,000 shares of Curbstone stock—the Spanish Shares—by defendants Chachas, Brooksbank, Hantges, and nonparty Franklin on December 12, 1997, to defendants Customer Safety, Cambiarios, and Construcciones.[46] Under the terms of this sale, which was negotiated in the weeks prior to the actual transfer, the Management Shareholders received approximately 3.9 cents a share, resulting in a total payment of $100,000. The Management Shareholders did not register these sales. Many of these shares ultimately were resold to the public, again without registration.[47]

Nevertheless, all of the defendants, but most importantly Chachas, who negotiated the sales on behalf of the Management Shareholders, argue that the sales to the Spanish entities were exempt from Section 5's requirements. Chachas argues that the sales

did not violate Section 5 because those sales fit clearly within *the exemption afforded by Section 4(1)* of the Securities Act for transactions by any person other than an issuer, underwriter or dealer. The stock that he sold in post-acquisition transactions had been obtained by him while a registration statement was in effect and thus was not restricted. Further, at the time of his first sales and thereafter, *he was no longer an affiliate of the company,* because he had resigned as an officer and director, and because he had carefully structured the transactions of December 18 so that the 15,000,000 new shares of stock were issued to the WTS before his own sale.

(Emphasis added). The SEC claims that the exemption relied upon by the defendants ("the 4(1) exemption") does not apply, because the Management Shareholders were "affiliates," as that term will be defined below, and therefore stood in the shoes of the issuer, at the time of the sale.

The Court finds that the 4(1) exemption does not apply. Section 4(1) of the Securities Act, codified at 15 U.S.C. § 77d, provides, in pertinent part, that "[t]he provisions of section 77e of this title shall not apply to ... transactions by any person other than an issuer, underwriter, or dealer." 15 U.S.C. § 77d(1). The purpose of this exemption is to allow the free trading among individual investors of securities that have already been registered. Thus, a transaction is exempt from Section 5's requirements if it is a trade by an ordinary investor rather than an issuer, underwriter, or dealer. A party seeking to invoke this exemption has the burden

---

**45.** Although the defendants dispute that they were required to file a registration statement before selling their shares, they do not dispute the fact that they did not do so.

**46.** As noted above, the Management Shareholders also negotiated the sales of 542,000 shares pursuant to an option agreement. Although these sales may be analyzed under Section 5 in much the same manner as are the sale of the first 2.5 million shares, the Court will focus its analysis initially on the Spanish shares. This approach is consistent with the manner in which

the SEC has framed the case since filing the Complaint.

**47.** The exact number of shares that were resold in unclear. Nevertheless, the records from the trading accounts maintained by the Spanish entities at Donald & Co. show that over 800,000 shares were sold from Cambiarios' account into the public market. At least 300,000 other shares, transferred from Customer Safety's account to accounts held by the relief defendants, were also sold into the market.

of proving that the exemption applies.[48] *See Ralston Purina,* 346 U.S. at 126 (1953).

Section 2 of the Securities Act sets forth the definitions of "issuer" and "underwriter." Section 2(4) defines an "issuer" as "any person who issues or proposes to issue any security." 15 U.S.C. § 77b(a)(4). The issuer is generally the company that issues a security. Section 2(11) defines the term "underwriter" as

> *any person who has purchased from an issuer with a view to,* or offers or sells for an issuer in connection with, *the distribution of any security,* or participates or has a direct or indirect participation in any such undertaking, or participates or has a participating in the direct or indirect underwriting of any such undertaking.

15 U.S.C. § 77b(a)(11) (emphasis added). For the purposes of the definition of an "underwriter," the term "issuer" is defined as including, "any person directly or indirectly controlling or controlled by the issuer, or any person under direct or indirect common control with the issuer." *Id.* To establish that a person is "under direct or indirect common control with the issuer," the SEC has generally asked whether the particular person is "in a position to obtain the required signatures of the issuer and its officers and directors on a registration statement." Loss and Seligman, *supra* note 5 at 247.[49]

The SEC claims that Chachas and the Curbstone Management Shareholders were "issuers" under the foregoing definition, or affiliates, when they sold the Spanish shares in that they were under direct or indirect common control with the issuer, Curbstone. The SEC bases this argument on the facts that two of the Management Shareholders, Chachas and Brooksbank, were officers and directors of Curbstone, and that the group collectively controlled 97% of its stock prior to the merger with WTS. Because the SEC maintains that the sale of the Spanish shares occurred *prior* to the completion of the merger with WTS on December 18, it argues that, at the time of the sale, the Management Shareholders were still in control of Curbstone. In the alternative, the SEC argues that, should the Court find that the actual sale occurred after the merger, the Management Shareholders—acting through Chachas—*offered* to sell their shares prior to the merger, and that such an offer alone constitutes a violation of Section 5.[50]

Chachas concedes that if the sale of the Spanish Shares occurred while he was an affiliate, then the sale would have been unlawful under Section 5.[51] Chachas' testimony and written submissions make clear that he understood the implications of selling the Management Shares before the merger was completed—while the Management Shareholders were still affiliates—and that he studiously crafted the transactions so as to

---

**48.** If the burden were on the SEC, however, I would still find that the 4(1) exemption does not apply.

**49.** Henceforth in this opinion, the Court will use the terms "control persons" and "affiliate" interchangeably in the place of the term "issuer," as that term is defined in Section 77b(11), for the purposes of determining who is an "underwriter." The term "affiliate" is defined in Rule 144 as "a person that directly, or indirectly through one or more intermediaries, controls, or is controlled by, or is under common control with, such issuer." 17 C.F.R. § 230.144(a)(1). "Control" is defined in Rule 405 as "the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting securities, by contract, or otherwise." 17 C.F.R. § 230.405.

**50.** In addition, the SEC argues that the sale of the Spanish shares was a sale of unregistered

shares because those shares were "restricted" stock, meaning that they could not freely be sold to the public. Chachas contends, however, that the S–8 form filed by Curbstone with the SEC on November 6, 1996, in connection with the issuance of these shares, was sufficient to register them and that consequently the shares were not "restricted" stock. The SEC's view is that the S–8 filing did not "cover the public redistribution of those shares" because it "did not include a resale prospectus." Because I find that Chachas sold the Spanish Shares while an affiliate, it is unnecessary for me also to resolve at present this additional dispute about the status of the shares.

**51.** The defendants have not disputed, for purposes of defending against the charge that Chachas sold affiliate securities, that the sale was a public as opposed to a private sale of securities. As will be discussed below, Chachas claims that he believed *during the negotiation stage* that the Spanish entities did not intend to resell into the public market.

make it appear, at least formally, that the sales occurred after the merger.

The liability of the Management Shareholders, the Spanish entities, and the other defendants who played a substantial role in the sale of the Management Shares thus turns on whether the Management Shareholders were in fact "issuers" within the meaning of Section 2(11)—or affiliates or control persons—at the time of the sale of the Spanish Shares. Alternatively, these defendants may be found liable if the SEC is correct that an offer to sell occurred prior to the completion of the merger and that such an offer is sufficient to constitute a violation of Section 5.

The defendants (led by Chachas) would focus the Court's attention with respect to the first issue—whether the Management Shareholders were affiliates at the time of the actual sale—on the exact timing of the events in question. According to Chachas, the Management Shareholders ceased to be in control of Curbstone—soon to be renamed EOSC—on December 18th, at the moment that Day, the transfer agent for Curbstone, issued the 15.5 million new shares of Curbstone to WTS. At that moment, they contend, the ownership of the Management Shareholders was diluted from 97% to 16.6% of the company. Relying also on the facts that Chachas and Brooksbank had resigned as officers and directors of Curbstone before December 18, and that their resignations were accepted on December 18, Chachas claims that the December 18 transfer of the majority of the shares to WTS constituted the final act necessary to remove all vestiges of control from the Management Shareholders.[52]

If the Court were to separate the sale of the Spanish Shares from the acquisition transaction, I would find that the sale occurred first. Chachas' agreement to acquire

WTS was contingent on his prior receipt of $100,000—paid on December 12. As Levy wrote to Chachas on December 12, that payment completed the sale of the Spanish shares as of December 1—the date on the Purchase Agreement for those shares. Only with the receipt of that money did Chachas and Brooksbank resign and issue instructions to the transfer agent. Moreover, according to the December 23 8–K prepared by Chachas, the acquisition did not close until December 18.

When the substance of these events is elevated above this form, however, it is clear that they should be viewed through an "integrated" analysis. Although the Court is unaware of any SEC or court opinion applying the concept of "integration" to the precise question of whether a seller of securities is a control person, the concept has been applied in numerous other contexts covered by the securities laws. As Professors Loss and Seligman have described the rationale for integration:

> [b]ecause securities subject to a transaction exemption are exempted on a transaction-by-transaction basis, the possibility exists that an apparently exempt transaction is actually part of a larger offering for which no exemption is available. *The concept of "integrating" offerings is intended to prevent an issuer from avoiding registration by structuring a transaction in two or more apparently exempt offerings* (or one exempt and one nonexempt offering) when they actually should be considered a single nonexempt transaction.

Loss and Seligman, *supra* note 5 at 278 (emphasis added). *See also SEC v. North American Research and Dev. Corp.,* 424 F.2d 63, 70–71 (2d Cir.1970) (rejecting defendants' attempt to use an exemption under the Securities Act to insulate their distribu-

---

**52.** Chachas also argues that he and Brooksbank lost all control when they resigned as officers and directors on December 12, or even earlier when they signed the Exchange Agreement on December 8. At that moment, Chachas claims, they were contractually bound to follow through on the acquisition, and all remaining duties that they were to perform were purely ministerial. This argument is unavailing. First, the Court finds that Chachas did not feel that he was contractually bound by the Exchange Agreement as of December 8, but that he was prepared to hold the merger hostage until the payments from Levy were deposited into his account, which occurred on December 12. In addition, as is explained at length below, the Court does not rest its finding that Chachas was a control person solely on his titular duties or his functions performed for the company, but rather on an integrated analysis of the transactions at issue.

364

tion of stock by analyzing the "substance of the transactions" and finding the purposes of the Securities Act best served by treating separate acts as "jointly conceived and jointly consummated"); Non–Public Offering Exemption, Securities Act Release No. 4552, 1962 WL 3573, at *3–4 (S.E.C. Nov. 6, 1962) (discussing how the concept of integration could be applied to find public offering where an issuer claimed there were only several private offerings); The Crowell–Collier Publishing Company, Securities Act Release No. 3825, 1957 WL 7724 (S.E.C. Aug. 12, 1957) (same); Securities Act Release No. 4434, 1961 WL 3670, at *1–2 (S.E.C. Dec. 6, 1961) (discussing how the concept of integration could be applied to find a public offering without exemption where an exemption for a local offering was claimed). *Cf. Universal Major Indus. Corp.*, 546 F.2d at 1047 (approving use of the integrated offering concept although not requiring the SEC to establish its existence in connection with that Section 5 violation). Bearing in mind that the policy objective of the Securities Act is "to protect investors by promoting full disclosure of information thought necessary to informed investment decisions," *Ralston Purina*, 346 U.S. at 123, and that exemptions should be interpreted "in light of the statutory purpose," *id.*, the Court finds that Chachas' formalistic view of the events in question must be rejected in favor of an integrated analysis.

Applying this analysis, the Court finds that the two allegedly separate transactions—*i.e.*, the merger of Curbstone with WTS and the sales of the Spanish Shares—should be treated as one, since the documentary and testimonial evidence strongly supports an inference that they were one in the minds of the individuals who structured them. More importantly, however, the Court finds that they should be viewed as one because of their significance—when viewed together—to the investing public.

As the SEC has explained in the context of analyzing whether an offering of securities is public or private,

> [t]he following factors are relevant to [the] question of integration: whether (1) the different offerings are part of a single plan of financing, (2) the offerings involve issuance of the same class of security, (3) the offerings are made at or about the same time, (4) the same type of consideration is to be received, (5) the offerings are made for the same general purpose.

Securities Act Release No. 33–4552, 1962 WL 3573, at *3. *See also* Loss and Seligman, *supra* note 5 at 278–282. Not all of these factors need be established to justify a finding that transactions claimed to be separate were in fact one integrated transaction. Indeed,

> [n]either the Commission nor the courts have provided express guidance on how to weigh these factors when analyzing an integration problem. A review of the cases and no-action letters strongly suggests that the "single plan of financing" and "same general purpose" factors normally are given greater weight than the other factors.

*Id.* at 280.

Here, the merger between WTS and Curbstone and the sales of the Spanish Shares were so interconnected that one would not have happened without the other. Indeed, the Purchase Agreements entered into between the Spanish entities and the Management Shareholders explicitly provided that the sales would not occur unless and until the merger with WTS was completed. Similarly, Chachas made clear in his correspondence with Levy that the merger with WTS would not go forward until he actually had the cash in his account representing the $100,000 payment for the Spanish Shares and the $450,000 payment for the first round of the options. Although Chachas backed away from this theory of the events during his testimony, the documents that he drafted speak for themselves. In addition, the theory that the transactions were integrated is consistent with the position expressed by Chachas and Brooksbank throughout this proceeding, including their in-court testimony, that the Management Shareholders originally hoped to get $125,000, plus stock, out of any merger that Curbstone entered into with an operating company. The Management Shareholders received the $125,000 they sought in two installments: the $25,000 non-refundable

cash deposit and the $100,000 payment for the sale of the Spanish Shares. Viewed objectively, and subjectively from the perspective of the Management Shareholders, the merger and the sales of the Spanish Shares therefore were clearly part of a single plan of financing, and shared the same general purpose—*i.e.*, to provide the group with its desired investment return.

From the perspective of Levy, Cavanagh, and Milestone, the two events also were part of a single plan of financing and shared a general purpose. These three defendants were interested in bringing about the acquisition of WTS, ever since they had been retained by that company to provide financing. Viewing the facts in the light most favorable to them, Levy, Cavanagh, and Milestone at the very least had an incentive to arrange the Spanish sales in order to ensure that the Curbstone shareholders went through with the acquisition. Accordingly, Cavanagh and Levy arranged for the Management Shareholders to sell their shares to the Spanish entities. Thus, despite Cavanagh's protestations to the contrary in court, he knew that the merger would not go through unless the sales of the Management Shares were assured and that the two events therefore were part of one larger scheme.

Weighing the evidence according to its probative force, instead of in the light more favorable to Cavanagh, the conclusion is compelling that the sale of the Spanish Shares furthered Cavanagh's consistent effort to gain control of as many shares as possible from the acquisition. Charts Chachas had prepared and sent to Levy during the negotiations of the acquisition reflect vividly how essential it was to Levy and Milestone that the latter obtain a significant number of shares from the acquisition. According to those charts, Milestone intended to use 10% of EOSC's equity (the 2,108,481 shares intended for Optimum and Agira) to raise $1 million, and 2.88% (the 607,081 shares intended for Inversora) to raise $3 million. Thus, although WTS had expected that it would be necessary to use 40% of its equity to raise $4

million, Milestone intended to use just 12.88%. The remainder of the 40% would be split between Milestone and Levy, the former getting 22.16%, the latter 3.56%. Thus, the final chart Chachas prepared, which was sent to Levy on December 5, reflected Milestone getting 2,563,000 or 12.16% of the equity by purchasing the Spanish Shares for $125,000, as well as getting another 2,108,481 shares or 10% of the equity. The final distributions of equity are not very different from these plans. In rounded figures, Curbstone kept 3% of the shares (after the sale of 300,000 shares pursuant to the option agreement); WTS received 57% of the shares; 10% of the equity went to Agira and Optimum for their $1 million investment; 3% of the equity was given to Inversora in return for a promised $3 million investment; 2% of the equity went to Levy; and the balance, roughly 24% of the shares, went to Milestone.

Even more to the point, however, what was essential to Milestone was its control of the "float," that is, the number of shares that could be traded. All of the shares issued by Curbstone for the acquisition were unregistered, were accompanied by a legend on the stock certificate explaining that fact, and therefore were unavailable for resale into the public market. Before Chachas and Levy negotiated the sale of the Spanish Shares to Milestone, those shares were slated for cancellation. At that point in time, therefore, it was expected that the Management Shareholders would have 925,217 shares, 80% of which would be under Milestone's control: 542,000 through the option agreement and 200,000 through a lock-up agreement running until March 15, 1997. Once Milestone negotiated the additional purchase of the Spanish Shares, it increased its control of the float to 95%.[53]

The Court therefore finds that the two events were integrated in the minds of their architects, that they were part of a single plan, and that the events occurred at or about the same time and were made for the same general purpose. Equally as important

---

**53.** Milestone purchased 2,563,000 Spanish Shares, had an option agreement covering 542,000 Management Shares, and a lockup agreement covering another 200,000 shares. Consequently, only 183,000 Management Shares remained beyond Cavanagh's control.

for determining whether a violation of Section 5 has occurred, however, are the implications of these events for investors who ultimately bought or sold the shares that were made available to the public as a result of these transactions. Thus, it is also relevant to ask whether investors received all the information to which they were entitled under the Securities Act before the shares released through this transaction were bought and sold in the public market. *See Ralston Purina*, 346 U.S. at 125 ("the applicability of Section 4(1) should turn on whether the particular class of persons affected need the protection of the Act"); *Universal Major Indus.*, 546 F.2d at 1047 (the inquiry under Section 5 depends "not so much upon the nature of the offering as upon the need for protection of the class of offerees; *i.e.*, whether they have the information which a registration would disclose, or have access to it").

The Court finds that investors did *not* have all the information to which they were entitled concerning the acquisition, and that material information that was uniquely in the possession of the Management Shareholders—including, most importantly, information relating to the sales of the Spanish Shares, the option agreement, and the Regulation S transactions—was not disclosed. This is precisely the kind of information that control persons are presumed to have, and which the Management Shareholders did not cease to have upon the issuance of 15.5 million new shares to WTS. It would be an odd construction of Section 5 indeed if affiliates of a company, who are limited in their ability to sell their stock to the public precisely because of their presumed superior access to information about the company, suddenly faced no limitations five minutes (or however long it took Day to issue the 15.5 million shares to WTS) after they ceased to be affiliates. To accept Chachas' argument that the literal transfer of majority ownership constitutes the moment at which a former affiliate may sell freely into the market is to ignore the guiding purpose of the Securities Act—the protection of "those who do not know market conditions from the overreachings of those who do," *Charles Hughes & Co. v. SEC*, 139 F.2d 434, 437 (2d Cir.1943)—and

the rationale for restrictions on affiliate shares in the first place. *Cf. North American Research and Dev. Corp.*, 424 F.2d at 71 (discouraging a trial court from attributing "undue significance to the date ... when control passed"). *Compare* Rule 144(k) (establishing that certain restrictions under Rule 144 do not apply to the sale of restricted securities when the sale is for the account of a person who has not been an affiliate for *three months* ). 17 C.F.R. § 144(k) (emphasis added). *See also* A.A. Sommer, Jr., "Who's 'In Control'—S.E.C.," 21 *Bus. Law.* 559, 579 (1966) (suggesting a rule that restrictions concerning control persons should no longer be applicable where "a bona fide severance of participation in or influence over or control of the issuer occurs with no reasonable expectation of its rehabilitation"). To put it another way, if the December 23 8-K prepared by Chachas and filed on behalf of Curbstone and EOSC to report the acquisition had been filed at the time of the acquisition and fully and accurately disclosed all material information relating to the terms of the acquisition, then the Curbstone shareholders would have held no unfair advantage over the American investor, and their loss of control would have immediately allowed them to sell their stock holdings without further registration.

The question of whether a person is in a position of "control" is a question of fact and depends on the totality of the circumstances, including an appraisal of the influence the individual has on the management and policies of a company. *See United States v. Corr*, 543 F.2d 1042, 1050 (2d Cir. 1976). A person can be in a position of control over a corporation even without owning a majority of the voting stock. *Id.* Here, the Court finds that the SEC has amply met its burden of establishing that, for purposes of determining whether a Section 5 violation occurred, the Management Shareholders, acting through Chachas, were in a position of control over the company at the time that their shares were sold to the Spanish entities, even if the certificates comprising the majority ownership of the merged entity were transferred simultaneously or a few moments before the certificates effecting the

sale of Spanish Shares were transferred.[54] Throughout the days at issue here, the Management Shareholders controlled the decision of whether to acquire WTS and whether to file a registration statement to cover their sale of the Management Shares. They chose to proceed with the former and to omit the latter.[55] Accordingly, the Court finds that the sale of the Spanish Shares was not exempt from registration under Section 4(1), because, for all practical purposes, it was a sale by affiliates.

2. The "Offer" of the Management Shares

■ The Court turns next to the SEC's alternative argument that an offer to sell unregistered securities constitutes a violation of Section 5. The pertinent section provides:

it shall be unlawful for any person, directly or indirectly ... *to offer to sell* or *offer to buy* ... any security, unless a registration statement has been filed as to such security ....

15 U.S.C. § 77e(c) (emphasis added). The SEC contends that, at a minimum, Chachas offered to sell the Management Shares to the Spanish entities in the two weeks prior to the completion of the merger, while he and the Management Shareholders unequivocally were still affiliates.

Chachas responds that, as an affiliate, he was only engaged in "preliminary negotiations" to sell the shares, apparently in reliance upon the definition of "offer to sell," in which Congress specifically excluded, for purposes of 15 U.S.C. § 77e(c),

*preliminary negotiations* or agreements between an issuer (or any person directly

or indirectly controlling or controlled by an issuer, or under direct or indirect common control with an issuer) and any underwriter ....

15 U.S.C. § 77b(a)(3) (emphasis supplied). Accordingly, Chachas characterizes the discussions with Levy and the signing of the Purchase Agreements as "preliminary negotiations" for the sale of the securities. Alternatively, Chachas contends that there was no offer made for the sale of the Management Shares prior to the merger, because the sale of the shares was always conditioned upon the completion of the merger and, in addition, could be rescinded if the Management Shareholders decided for any reason that they did not want to go through with the deal.

The Court finds both of Chachas' arguments meritless. First, the "preliminary negotiations" exemption contained in Section 77b(a)(3) does not insulate all preliminary negotiations prior to a public sale by an issuer or affiliate. Instead, it insulates only those negotiations whereby an issuer or affiliate establishes an arrangement with underwriters, prior to the filing or approval of a registration statement, for the distribution of securities to the public. *See* Loss and Seligman, *supra* note 5 at 80–81. Where no registration statement is contemplated, as was the case here, the exemption for preliminary negotiations is inapplicable.

■ Second, the Court finds unpersuasive Chachas's reasoning as to why an offer was not made in this case. Citing numerous provisions of *Corbin on Contracts* and the *Restatement of Contracts*, Chachas claims that no offer existed on these facts because the

54. The defendants raised toward the end of the hearing the argument that the Court should only consider half of the Management Shares—those owned by Chachas and Brooksbank—as control shares, because only these two were officers and directors of Curbstone. This argument misses the point, addressed repeatedly in this Opinion, that Franklin and Hantges had surrendered control over their shares to Chachas for the purpose of negotiating all four shareholders' exit from the company. For all practical purposes, therefore, the shares owned by all four shareholders were one block under the control of Chachas, at all times relevant to the Court's Section 5 analysis. Or, phrased another way, all four men functioned as members of a control group. *Cf. North*

*American Research and Dev. Corp.*, 424 F.2d at 67, 72 (taking functional approach to issue of control).

55. Chachas testified at the hearing that the decision to proceed with the transaction in the manner that he did was influenced by the cost and delay that would have been associated with filing a registration statement. When asked by the Court if he could not have sold his shares while still an affiliate by filing another registration statement for those shares, Chachas responded, "Yes. That would have been one alternative, but it's very expensive and time consuming."

Spanish entities were incapable of creating a binding contract through their simple "acceptance" of the terms that had been conveyed to them by Chachas. In essence, Chachas argues that there was no offer because (1) any "contract" that would have been created was subject to the condition precedent that the acquisition occur; and (2) the "contract" would have been illusory because it gave the Management Shareholders the unilateral right to cancel the transaction without penalty.

Even if the Spanish entities had no legal recourse in the face of cancellation of the transaction, the existence of an "offer" is not undermined whether analyzed under the common law or under the Securities Act. The enforceability of a contract is simply not the touchstone for the existence of an offer.

The Securities Act defines "offers" broadly to include "every attempt or offer to dispose of, or solicitation of an offer to buy, a security or interest in a security, for value." 15 U.S.C. § 77b(a)(3). This definition has been interpreted as going well beyond the common law concept of an offer. *See Diskin v. Lomasney & Co.*, 452 F.2d 871, 875 (2d Cir. 1971). If Section 5 were concerned only with the creation of legally enforceable contracts for the sale of unregistered securities, Section 77e(c)'s prohibition on offers to sell or offers to buy would not have been included in the statute. Thus, even if the "offer" in this case, once accepted, did not give rise to an enforceable contract, that fact is immaterial for purposes of determining whether the harm with which Section 5 is concerned occurred.

Although the Second Circuit in *Diskin* did not decide "whether or not a dealer can lawfully make a conditional and revocable offer to sell ... if it is made clear that the offer cannot be accepted until the effective date," 452 F.2d at 875, the Court finds that, on the facts of this case, the conditional nature of the Management Shareholders' offer does not preclude a finding that an offer within the meaning of the Act was made. Unlike in *Diskin*, which was concerned with a dealer rather than an issuer, no registration statement was ever contemplated for the sale of these shares. In addition, not only

had an offer been made, but money had been received in "acceptance" of the offer. Finally, it was entirely within the power of the offerors in this case to ensure that the conditions that they had attached to their offer were met. By December 8, the merger agreement between WTS and Curbstone had been signed by Chachas, and according to the testimony of Chachas and Brooksbank, only ministerial acts remained to be done after December 12 to ensure the transaction's completion. Thus, the condition precedent contained in the Purchase Agreements, that the merger be completed before the shares would be transferred, hardly injected into the transaction the element of uncertainty that Chachas would have the Court believe. Taking into account the realities of the situation, the Court finds that an offer to sell affiliate shares in fact was made in violation of Section 5, culminating in a sale, as outlined above, of affiliate securities.

### 3. The Claimed 4(1) 1/2 Exemption

Chachas claims that, even if the Court should find that he made an offer of securities or sold securities while he was an affiliate, an injunction would not be warranted since he did not act with scienter. According to Chachas, he was entitled to and did rely on an exemption known as 4(1) 1/2, which is not contained in the Securities Act but nevertheless has been recognized implicitly by the SEC and explicitly by commentators. *See, e.g.,* Loss and Seligman, *supra* note 5 at 338; Hicks, *Exempted Transactions Under The Securities Act of 1933* § 9.05 (1992); The Section "4(1) 1/2" Phenomenon: Private Resales of "Restricted" Securities, 34 *Bus. Law.* 1961 (1979).

The 4(1) 1/2 exemption, which allows affiliates to sell substantial amounts of their shares to private investors, has been so named because it falls between the cracks of the 4(1) and 4(2) exemptions, which allow, respectively, for private sales among persons who are not issuers, underwriters, or dealers, and for private sales by an issuer. As is the case for an issuer claiming an exemption for a private sale under 4(2), an affiliate claiming a 4(1) 1/2 exemption has the burden of estab-

lishing that such sales do not constitute a disguised public distribution.

Here, Chachas claims that, although he did not rely on 4(1) 1/2 for the ultimate sale of the Management Shares, he believed that his negotiations with the Spanish entities, through Levy and Cavanagh, were exempted from Section 5 because of this provision.[56] During his testimony, Chachas referred to the "reps and warranties" contained in the Purchase Agreements. The portion of the agreements to which Chachas referred provided that

> [t]he Purchaser is investing solely for its own account and has no present agreements to transfer rights to this Subscription Agreement or to the Shares to any other person.

Acknowledging that he did no research on the Spanish entities who signed these agreements, Chachas contends that the aforementioned "reps and warranties" provided sufficient assurance that the shares would not be sold into the public market. According to Chachas, his insertion of these "reps and warranties" into the Purchase Agreements satisfied any due diligence required of him under law.

The Court finds this not to be the case. Although the SEC has never articulated exactly what steps an issuer or affiliate must take to fall within the private placement exemption, the elicitation of bare representations that the buyer does not have any present agreement to resell is plainly insufficient. As the Commission advised in The Crowell–Collier Publishing Co.,

> An issuer may not establish a claim to an exemption under Section 4(1) [now 4(2)] merely by collecting so-called "investment representations" from a limited group of purchasers if in fact a distribution by such persons occurs. Counsel and their issuer and underwriter clients *cannot base a claim to exemption* from registration under the Securities Act *upon the mere acceptance at face value of representations*

by purchasers that they take for investment and disclaim responsibility for investigation and consideration of all relevant facts and circumstances pertinent to a determination that the transactions do not involve a public offering.

Securities Act Release No. 3825, 1957 WL, at * 5 (emphasis added).

That a buyer who purported to buy for investment purposes sells to the public within a short period of time is not conclusive of the buyer's intent at the time of purchase from the issuer or affiliate. *See* Loss and Seligman, *supra* note 5 at 329. Nevertheless, such a rapid resale raises a strong inference that the buyer intended to resell, and puts the burden on the affiliate or issuer to demonstrate that it took adequate precautions to ensure that such a resale would not occur. Accordingly, the SEC has noted approvingly of precautions such as placing a legend on the securities alerting the buyer to the restricted character of the securities. *See* 17 C.F.R. § 230.502(d), Regulation D—Rules Governing the Limited Offer and Sale of Securities Without Registration Under the Securities Act of 1933 ("Regulation D") (approving the use of a legend as an indication that the seller has taken reasonable care to ensure that shares sold pursuant to a private placement are not resold into the public). As the Second Circuit observed in affirming a preliminary injunction in 1975 against Levy,

> [g]ranting that it was not an unconditional requirement of a valid private placement at that time, it is clear, and an expert such as Levy must have known, that such *a legend is the single most effective device for preventing resale of restricted shares.*

*SEC v. Management Dynamics*, 515 F.2d at 810 (emphasis supplied).

Another effective device is the issuance of a "stop-transfer order" to the transfer agent for the securities, which would prevent the buyer from reselling without obtaining an opinion by counsel for the issuer as to the legality of the resale.[57] *See* Use of Legends

---

**56.** If the 4(1) 1/2 exemption actually applied to Chachas' negotiations, it would also exempt the sales of the shares. As already noted, there is no different standard for offers to sell as opposed to sales.

**57.** The Exchange Agreement contained several of these approved cautionary measures to ensure that the shares issued to WTS in the merger, which were restricted, would not be sold to the public without registration. For example, the

and Stop–Transfer Instructions as Evidence of Non–Public Offering, Securities Act Release No. 5121, 1970 WL 10604 (S.E.C. Dec. 30, 1970). In addition, the prudent issuer or affiliate may wish to make inquiries into the financial condition of the buyer to determine, for example,

> whether the amount of securities purchased is unduly large in relation to his or her financial means, or whether he or she borrowed to finance the purchase so that he or she might intend or be forced to resell in the near future in order to repay his loan. Prudence would seem also to dictate some inquiry, before making a sale, into the prospective buyer's record with respect to holding securities for long-term investment in the past.

Loss & Seligman, *supra* note 5 at 334. At the very least, an affiliate who sells under the private placement exemption should know the identity of the buyers who purport to take for investment purposes. *See* The Cro-

well–Collier Publishing Co., 1957 WL 7724, at * 5.

Chachas, Levy, and Cavanagh admit that they took none of these precautions.[58] Although it is clear from the investment letter obtained from WTS as part of the Exchange Agreement that at least Chachas and Levy knew how to extract a detailed representation that restricted shares would not be resold, *see* note 57, *supra*, no similar commitment was sought regarding the Spanish Shares. Chachas admitted that he did not know the identity of the buyers until the Purchase Agreements were signed, but conveyed blank Purchase Agreements to Levy and Cavanagh for signature by whomever the purchasers turned out to be. Cavanagh testified that he did no independent research on the Spanish entities, but relied on the representation made by Vicente Tur Ortola, the Spanish lawyer, that these clients were interested in a long-term investment. Thus, none of the defendants who were involved in

Agreement contained a detailed investment letter from WTS representing, *inter alia*,

> 1. The Securities, which are being acquired by the undersigned are being acquired for the undersigned's own account and for investment and not with a view to the public resale or distribution thereof.
> 2. The undersigned will not sell, transfer or otherwise dispose of the securities unless, in the opinion of the Company's counsel, such disposition conforms with applicable securities laws requirements.
> 3. The undersigned is aware that the Securities are "restricted securities" as that term is defined in Rule 144 (the "Rule") promulgated under the Securities Act of 1933, as amended
> . . . .
> The undersigned acknowledges and understands that the Securities are unregistered and must be held indefinitely unless they are subsequently registered under the Act or an exemption from such registration is available.
> The undersigned further acknowledges that the undersigned is fully aware of the applicable limitations on the resale of the Securities. These restrictions for the most part are set forth in Rule 144 ("the Rule"). The Rule permits sales of "restricted securities" upon compliance with the requirements of such Rule. If and when the Rule is available to the undersigned, the undersigned may make only sales of the Securities in accordance with the terms and conditions of the rule (which may limit the amount of securities that may be sold) . . . .
> Any and all certificates representing the Securities, and any and all securities issued in

replacement thereof or in exchange therefor, shall bear a restrictive legend.

> The undersigned further agrees that the Company shall have the right to issue stop-transfer instructions to its transfer agent until such time as sale is permitted under Security Laws and acknowledges that the Company has informed the undersigned of its intention to issue such instructions.

The Exchange Agreement provided that the following legend would appear on all shares issued to WTS:

> THE SHARES REPRESENTED BY THIS CERTIFICATE HAVE NOT BEEN REGISTERED WITH THE SECURITIES AND EXCHANGE COMMISSION UNDER THE SECURITIES ACT OF 1933, AS AMENDED. THE SHARES HAVE BEEN ACQUIRED FOR INVESTMENT AND MAY NOT BE SOLD, TRANSFERRED, ASSIGNED, PLEDGED OR HYPOTHECATED IN THE ABSENCE OF AN EFFECTIVE REGISTRATION FOR THESE SHARES UNDER SUCH ACT OR AN OPINION OR THE COMPANY'S COUNSEL THAT SUCH REGISTRATION IS NOT REQUIRED UNDER SAID ACT.

58. Chachas argues in his supplemental memorandum of law that "a seller of securities need not meet all the requirements of Sections 4(1) or 4(2)—or the SEC regulations that define the safe harbors thereunder [such as Regulation D]—in order to rely on the Section 4(1) 1/2 exemption." While this may be true, Chachas did not in good faith take *any* of the steps recommended by the SEC in Regulation D or its releases on the subject of private placements.

the sale of the Spanish Shares had any knowledge of the financial condition of the purchasers, their corporate structure, the identity of their principals, or their history of investment. Accordingly, Chachas' argument that the offer was covered by the 4(1) 1/2 exemption because the Spanish entities did not intend to resell must fail.[59]

This argument also appears quite disingenuous in light of the testimony by all of the defendants associated with the transaction, and the early documents drafted by Chachas, that Chachas was informed that the purchaser of the shares—whom he initially was told would be Milestone—was interested in "free-trading" shares. The argument likewise is implausible in light of the record demonstrating the efforts made by Chachas to ensure, at least formally, that the Management Shareholders were no longer affiliates at the time of sale. Although Chachas' counsel correctly notes that there is no authority preventing an individual from claiming two different exemptions for a transaction, the Court finds that Chachas' alternative arguments in reality are not different legal arguments so much as they are different factual arguments. Either the evidence demonstrates that Chachas thought that the Spanish Shares were purchased solely for investment purposes—such that he could have offered and sold them even as affiliate shares—or it does not. Chachas has not argued that his understanding of the intent of the purchasers evolved over time. To the contrary, his testimony was clear that he did not know whose name would be on the Purchase Agreements until he received them back after their execution.

More importantly, however, all of the evidence—including the testimony by Levy, Cavanagh, and Brooksbank, as well as Chachas' own actions—supports a finding that Chachas knew the entire time that the shares had to appear to be freely tradeable at the time of sale, because that was what the purchasers wanted. In short, Chachas knew, or had reason to know, that the purchasers intended to resell to the public. Although Chachas claimed at the hearing that he believed that both exemptions applied, and that he acted out of an excess of caution, the evidence strongly supports that Chachas actually believed that neither exemption applied, but worked to make it appear that the transaction qualified for the 4(1) exemption. He always considered the 4(1) 1/2 exemption a weak second string in his bow and thus raised it at the hearing belatedly and half-heartedly. Indeed, his testimony made clear that he did not have a solid understanding of the 4(1) 1/2 exemption and its requirements. The evidence suggests that, instead of structuring the "offer" part of the transaction from the outset so as to fall within the 4(1) 1/2 exemption, Chachas first considered the possible application of the exemption when Day, the transfer agent, raised questions about the sales of the affiliate shares, and then again when the SEC explained its theory that the offer of the shares violated Section 5.[60]

In sum, the Court finds that the evidence concerning the 4(1) 1/2 exemption does not indicate that Chachas acted in good faith, even when viewed in the light most favorable to him. There simply is no evidence to support a finding that he either actually or reasonably believed that the Spanish Shares had been purchased with a view to long-term investment rather than with an intent to resell. Having rejected this argument as to why he should not be enjoined against future violations of Section 5, the Court concludes that the SEC has a strong likelihood of proving successfully at trial that Chachas, on

---

59. As will be discussed below in connection with the fraud count, the SEC has demonstrated a substantial likelihood of proving at trial that the Spanish entities were Cavanagh's nominees and that both Chachas and Levy understood that to be so.

60. At the hearing, Day testified that he did raise at one time with Chachas his concern that "a substantial time had gone by from the S[8] registration, raising the question whether or not it would be appropriate to put an affiliate legend on the shares ...." Chachas then "assured" Day that "he wouldn't make any disposition of the shares while he was still an affiliate of the issuer...." Day stated that he recalled "a subsequent conversation on that same question while I understood this deal was pending in which George [Chachas] referred to the 4(1) 1/2 exemption as being a basis on which he would be able to transfer the shares."

behalf of the Management Shareholders, made an offer and a sale of affiliate shares in contravention of Section 5's requirements, and that he did so in knowing and intentional violation of the requirements of the law.

### 4. The Sale of the Option Shares

In light of the foregoing discussion, the analysis of the oral option agreement can be relatively brief. The terms of the agreement were effectively presented in writing by Chachas to Levy on December 3. The only material modification to those terms was the decision to advance the purchase of the first block of 150,000 shares covered by the options agreement to December 12, when Levy and Cavanagh sent Chachas $450,000. The record does not appear to reflect the date on which the certificates for those shares were transferred, but by later December the shares were apparently deposited in the Cambiarios account and were among the shares Cavanagh sold between late December and the end of January. Thus, Chachas, on behalf of the Management Shareholders, offered to sell and did sell Management Shares through an option agreement while an affiliate. These sales also violate Section 5, for all of the reasons set forth above with respect to the sale of the Spanish Shares.

### 5. The Liability of the Individual Defendants Under Section 5

 Under Section 5 of the Securities Act, "any person" is prohibited from selling unregistered securities that are not exempt from registration. 15 U.S.C. §§ 77e(a), (c). This liability extends beyond those who sell stock to all necessary participants in a sale of unregistered stock. *See Softpoint, Inc.,* 958 F.Supp. at 859–60 (finding liability where involvement was clearly necessary and substantial and not simply "de minimus"). *See also Universal Major Indus.,* 546 F.2d at 1046 (finding liability for individual who was indispensable to another's sale of stock). The SEC has demonstrated a substantial

likelihood that it will succeed at trial in proving that Cavanagh, Milestone, Cambiarios, Construcciones, Customer Safety, Optimum, Agira, Chachas, Brooksbank, and Hantges violated Section 5 by selling unregistered stock and that Levy was a necessary and substantial participant in those sales.

### 6. The Appropriate Relief for the Section 5 Violations

#### a) Freeze order as to the defendants' assets

 Because the Court finds a strong likelihood that the SEC will succeed on the merits in establishing a Section 5 violation, the Court finds that a continued asset freeze is appropriate,[61] in addition to a continuing order providing for an accounting and repatriation of assets. These orders are appropriate to preserve the status quo pending a determination on the merits, and should apply to all proceeds from the defendants' sales of EOSC shares as well as to any shares of EOSC that remain in their custody or control. This includes defendants Chachas, Brooksbank, Hantges, Levy, Cavanagh, Milestone, Customer Safety, Construcciones, and Cambiarios. The Court concludes, for reasons that will be explained below, that all of the Management Shares transferred to Customer Safety, Cambiarios, Construcciones, and Inversora were effectively under the control of Cavanagh and Milestone. Therefore, the amount of the freeze order as it applies to Cavanagh and Milestone shall include the proceeds from the sales of any of those shares, including sales by those who received Customer Safety shares unless those shares or proceeds have already effectively been frozen. As for Optimum and Agira, the Regulation S shares that they received are not subject to the freeze, because there is no evidence that those restricted shares, which appear to have been lawfully acquired, were resold. Any other EOSC shares in their possession, or the proceeds from the sale of any EOSC shares, are nevertheless frozen.[62]

---

**61.** For those defendants who have entered into agreements with the SEC in lieu of, or modifying, the asset freeze contained in the TRO, those agreements shall remain in effect pending a final determination of this case.

**62.** Optimum received 100,000 of the shares of EOSC stock distributed from the Customer Safety account, and has sold at least 71,500 of those shares. Agira bought and sold 1,500 EOSC shares.

In reaching the conclusion that a continued asset freeze is appropriate for the defendants' proceeds and remaining shares in EOSC, the Court relies on the considerations articulated in *Manor Nursing Ctrs.*, 458 F.2d at 1104–6, and *Unifund SAL*, 910 F.2d at 1041–43. In *Manor Nursing Centers*, the Second Circuit analyzed the freeze order imposed by the district court for its consistency with "the goal of compensating investors." *Id.* at 1106. *Unifund SAL* applied the same standard to hold that a freeze order was appropriate "in an amount sufficient to cover not just the profits that might have to be disgorged but the civil penalty, equal to three times the profits." *Unifund SAL*, 910 F.2d at 1041. Here, the SEC has represented that it will seek a penalty of twice the amount of profits received by each defendant. The Court finds that, with the exception of Cavanagh and Milestone, a freeze on the defendants' proceeds from the sales of EOSC stock, as well as the EOSC stock, will give "the Commission substantial security without unduly burdening the [defendants]." *Id.* at 1042. Although the Commission is statutorily authorized to seek penalties at trial, the Court finds that freezing the amounts sought in penalties would place certain of these defendants at risk of bankruptcy and could therefore jeopardize the long-term interests of those investors who were defrauded. *See Manor Nursing Ctrs.,* 458 F.2d at 1106.

### b) Preliminary Injunction as to Future Violations of Section 5

Having found a strong likelihood that the SEC will be able to prove a Section 5 violation at trial, the Court turns to the second prong of the *Unifund SAL* test for imposing a preliminary injunction, *i.e.,* whether there is a likelihood of repetition of the forbidden conduct. In deciding this question, it is appropriate to weigh the degree of a defendant's scienter, the sincerity of any assurances that the violation will not be repeated, whether the violation was an isolated one, any acknowledgement by a defendant of the wrongful nature of his conduct, and the defendant's opportunity because of his profession to repeat the violation. *Universal Major Indus.,* 546 F.2d at 1048. Applying these factors, the Court

finds that a preliminary injunction against future violations of Section 5 is warranted only as to defendants Levy, Cavanagh, Milestone, Customer Safety, Cambiarios, Construcciones, and Chachas.

Although the Court finds that there is a strong likelihood that the SEC will be able to prove at trial that the profits earned by the other defendants associated with this scheme should be disgorged, the Court finds that these defendants are not likely to engage in future violations of Section 5. Brooksbank was only peripherally involved with the transaction, is not involved in the securities industry on a daily basis, and appears to have no history of misconduct. Hantges was even more peripherally involved, and also appears to have no history of misconduct.

Levy and Cavanagh, by contrast, have a history of problems in the securities industry. As noted above, a permanent injunction was entered against Levy in 1975 for his participation in a securities fraud bearing remarkable similarities to this case. That injunction prohibited future violations of both the registration and antifraud provisions of the securities laws. As the Second Circuit held in that very case, "the commission of past illegal conduct is highly suggestive of the likelihood of future violations." *Management Dynamics,* 515 F.2d at 807. Levy also played a major role in structuring this transaction and knew that the transaction would result in the sale of affiliate shares. Although scienter is not necessary to find a violation of Section 5, it is persuasive in determining whether a particular defendant is likely to commit future violations, especially when scienter is combined with the defendant's refusal to provide assurances that future violations will not occur. *See SEC v. Posner,* 16 F.3d 520, 522 (2d Cir.1994). Thus, taking into account Levy's history of misconduct, his indispensable role in the scheme here, his degree of scienter, and his demeanor at the hearing—which conveyed a lack of concern with the seriousness of the charges and a sense of irritation at being asked questions—the Court finds that a preliminary injunction is appropriate as to this defendant.

Cavanagh has not previously been enjoined by a court, but was fined by the NASD when he was a broker in 1993. According to a contemporaneous news report, Cavanagh was fined $20,000 and barred from association with any NASD member in any capacity. These sanctions were based on findings that Cavanagh failed to provide testimony or to respond to NASD requests for information concerning transactions and activities in which he was involved while employed as a broker at F.N. Wolfe, a NASD firm. Although the Court is unaware of the details of that disciplinary action, the fact that the sanction was entered does not weigh in Cavanagh's favor.

The Court finds that Cavanagh was the impetus behind the overall scheme of which the Section 5 violation was a critical part. *See SEC v. Lorin,* 76 F.3d 458, 461 (2d Cir.1996) ("when the violation has been founded on systematic wrongdoing, rather than an isolated occurrence, a court should be more willing to enjoin future misconduct") (internal quotations omitted). Cavanagh had ample opportunity to learn that the transaction would result in the sale of affiliate shares, based on his longstanding relationship and frequent communication with Levy. Although Cavanagh has testified that he relied on Levy's advice as his attorney that the shares were freely tradeable, the Court finds that Cavanagh cannot establish a good faith advice-of-counsel defense on the basis of this record.[63] Cavanagh could not reasonably have expected Levy to render an independent opinion as to the legality of the transaction given his personal involvement in structuring it and his financial stake in its completion. *Cf. Arthur Lipper Corp. v. SEC,* 547 F.2d 171, 182 (2d Cir.1976). More importantly, however, the Court finds that it was Cavanagh who made it a *sine qua non* of the acquisition that he receive unlegended shares. The SEC has proven by substantial evidence that Cavanagh was un-

concerned with the legality of the transaction, but extremely concerned that he obtain shares that he could readily resell.

At the hearing, Cavanagh, like Levy, did not appear particularly troubled by the gravity of the allegations against him. Thus, taking into account Cavanagh's history, his role in this transaction, and his apparent lack of concern about this action, the Court finds that a preliminary injunction against future violations of Section 5 is appropriate against this defendant. If nothing else, the injunction may inspire a level of caution in Cavanagh that appears to have been missing from his prior business practice. Because Cavanagh is a 50% owner of Milestone, and undertook all of the actions at issue in this case on behalf of Milestone, the preliminary injunction is also properly entered against that corporate defendant. Because, as will be explained below, there is sufficient evidence to find that the three Spanish entities functioned as alter egos of Cavanagh, it is also appropriate to enjoin them. On the other hand, because the SEC has shown neither that Optimum and Agira were alter egos of Cavanagh, or other sufficient evidence to support an injunction, injunctive relief shall not issue as to these two entities.

Finally, the Court finds that a preliminary injunction against future violations of Section 5 is properly entered against Chachas. Chachas was co-architect with Levy of the Purchase Agreements for the Spanish Shares and the option agreement. As a securities lawyer close to the transaction, he was in the best position among all of the defendants, with the exception of Levy, to know that the transactions did not comply with the requirements of the Securities Act. By virtue of his profession as a securities lawyer, Chachas also is in a position to commit future violations of Section 5 if an injunction is not entered.

---

**63.** To establish an advice of counsel defense, a defendant "has to show that he made complete disclosure to counsel, sought advice as to the legality of his conduct, received advice that his conduct was legal, and relied on that advice in good faith." *Markowski v. SEC,* 34 F.3d 99, 105 (2d Cir.1994). *See also United States v. Evangelista,* 122 F.3d 112, 117 (2d Cir.1997), *cert. de-* nied, —— U.S. ——, 118 S.Ct. 1048, 140 L.Ed.2d 112 (1998) ("[r]eliance on advice, offered as a defense, presupposes the defendant's solicitation of advice in good faith") (internal quotations omitted). Even if these elements were satisfied, "reliance is not a complete defense, but only one factor for consideration." *Markowski,* 34 F.3d at 105.

To avoid the imposition of a preliminary injunction, Chachas claims that the issues of law raised by this transaction are so complex that he could not have been expected to know that his actions were unlawful. The Court finds this argument specious, inasmuch as the complexity arose solely because Chachas did not wish to follow the obligations clearly imposed by Section 5.

The documents drafted by Chachas in the course of the negotiations over the Exchange Agreement suggest that he is not the "Dudley Do–Right" that his attorneys have attempted to characterize him as. Instead, the documents reveal that Chachas had discerned by early December that Cavanagh and Levy had devised a plan to reap enormous profits from the merger with WTS. Rather than withdrawing from the transaction, Chachas set about ensuring that his group would get a generous portion of the profits.

As will be explained further below, the Court does not find that Chachas has made a career out of infractions of the securities laws. He appeared quite chastened at the preliminary injunction hearing, and his demeanor clearly indicated that he understood the seriousness of the charges and their implications for his career. Nevertheless, the Court finds that a preliminary injunction against future violations of Section 5 is warranted against Chachas based on his prominent role in the transaction, his degree of scienter, his opportunity to commit future violations, and his continued protestations of innocence. *See Lorin,* 76 F.3d at 461.

### D. Claims Under Sections 17(a) and 10(b)

The SEC alleges that the defendants violated two different statutory prohibitions against fraudulent activity. First, the SEC contends that the defendants violated Section 17(a) of the Securities Act, which is a general prohibition against fraud in the offer or sale of securities.[64] The three categories of activities prohibited by Section 17(a) do not have uniform culpability requirements. While scienter is a requirement to establish a violation of Section 17(a)(1), it is not a necessary element of the latter two categories. *See Aaron v. SEC,* 446 U.S. 680, 697, 100 S.Ct. 1945, 64 L.Ed.2d 611 (1980); *SEC v. First Jersey Secs., Inc.,* 101 F.3d 1450, 1467 (2d Cir.1996), *cert. denied,* —— U.S. ——, 118 S.Ct. 57, 139 L.Ed.2d 21 (1997).[65]

Second, the SEC alleges that the defendants violated Section 10(b) of the Exchange Act, which prohibits the use of manipulative or deceptive devices in connection with the purchase or sale of securities.[66] Section 10(b) is enforced through SEC Rule 10b–5 ("Rule 10b–5"), which prohibits the use of any device, scheme, or artifice to defraud; any untrue statement or omission of material fact; and any acts, practice, or course of business that operates as a fraud or deceit

---

**64.** Section 17(a) provides, in pertinent part:

> [i]t shall be unlawful for any person in the offer or sale of any securities by the use of any means or instruments of transportation or communication in interstate commerce or by the use of the mails, directly or indirectly—
> (1) to employ any device, scheme or artifice to defraud, or
> (2) to obtain money or property by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or
> (3) to engage in any transaction, practice, or course of business which operates or would operates a fraud or deceit upon the purchaser.

15 U.S.C. § 77q(a).

**65.** The SEC has not made clear which subsection of Section 17(a) it believes the defendants violat-ed. Because, as will be explained further below, the Court has no difficulty finding scienter, the Court need not address whether a violation of Section 17(a)(2) or (3) could be established in the absence of scienter.

**66.** Section 10(b) provides, in pertinent part:

> [i]t shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the use of the mails, or of any facility of any national securities exchange . . .
> to use or employ, in connection with the purchase or sales of any security registered on a national securities exchange or any security not so registered, any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

15 U.S.C. § 78j(b).

upon any person, in connection with the purchase or sale of any security. 17 C.F.R. § 240.10b–5.[67] Scienter is a necessary element of a Section 10(b) or Rule 10b–5 violation. *Aaron v. SEC*, 446 U.S. at 691.

The SEC has advanced three separate claims of fraudulent activity: first, that the defendants engaged in a manipulation of the market for shares of EOSC; second, that the 8–K form prepared by Chachas and filed by EOSC on December 23, 1997, contained material omissions; and third, that the defendants are responsible for the January 30, 1998 press release by EOSC that contained a false or misleading statement. Each of these allegations, if true, comes within the expansive prohibitions of Sections 17(a) and 10(b). *See Superintendent of Ins. of N.Y. v. Bankers Life and Cas. Co.*, 404 U.S. 6, 12, 92 S.Ct. 165, 30 L.Ed.2d 128 (1971) ("Section 10(b) must be read flexibly, not technically and restrictively"); *First Jersey Secs., Inc.*, 101 F.3d at 1467 (noting substantial similarity of elements of 10(b) and 17(a) violations).

The defendants dispute that any of the alleged violations occurred. In the alternative, each defendant argues that if a violation occurred, he did not have the knowledge or intent necessary to establish scienter. The Court will address each alleged violation in turn.

1. "The Market Manipulation"

The basic aim of the antifraud provisions of the securities laws is

to prevent rigging of the market and to permit operations of the natural law of supply and demand. The theory of a natural, unrigged market is that the competing judgments of buyers and sellers as to the fair price of the security brings about a situation where the market price reflects as nearly as possible a just price.

*First Jersey Secs.*, 101 F.3d at 1466 (internal quotations omitted). Where individuals prevent the law of supply and demand from setting the price for a stock, such activity is sometimes termed a "market manipulation." As the Supreme Court has explained,

"Manipulation" is virtually a term of art when used in connection with the securities markets. The term refers generally to practices, such as wash sales, matched orders, or rigged prices, that are intended to mislead investors by artificially affecting market activity.

*Sante Fe Indus., Inc. v. Green*, 430 U.S. 462, 476, 97 S.Ct. 1292, 51 L.Ed.2d 480 (1977) (internal quotations omitted). "One of the hallmarks of manipulation is some profit or personal gain inuring to the alleged manipulator." *United States v. Mulheren*, 938 F.2d 364, 370 (2d Cir.1991).

Loss and Seligman set forth the following "simplified composite picture" of a market manipulation:

The group first secures an option to purchase at a price higher than the then market quotation a large block of a stock which possesses actual or potential market appeal and an easily controllable floating supply. It is the task of the pool manager and operator to raise the market price above the option price, and, if the supply on the market remains constant, this can be accomplished only by increasing the demand. The most effective manner of inducing others to purchase is to have a favorable ticker tape record which indicates to prospective purchasers that others consider the security to be underpriced. The manager opens a number of accounts with various brokers and, fortified by a knowledge of the condition of the market obtained from the book of a specialist, enters both buying and selling orders with a preponderance of the former so that the

---

**67.** Rule 10b–5 states in full:

It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange, (a) [t]o employ any device, scheme, or artifice to defraud, (b) [t]o make any untrue statement of a material fact or to omit to state a material fact necessary in order

to make the statements made, in the light of circumstances under which they were made, not misleading, or (c) [t]o engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b–5.

price is made to rise slowly upon an increasing volume of transactions.

Loss and Seligman, *supra* note 5 at 929–30 (quoting Comment, Market Manipulation and the Securities Exchange Act, 46 Yale L.J. 624, 626–628 (1937)). Here, the Court finds that the defendants have engaged in a fairly classic market manipulation, variations on which are not unknown to the courts of this Circuit. *See, e.g., North American Research and Dev.,* 424 F.2d at 66–67; *Harwyn Indus.,* 326 F.Supp. at 945–46.

■ The first step in the defendants' market manipulation scheme was to locate a publicly-owned corporation that was an empty shell and to get control of the shell by acquiring substantially all of the shares of the shell's stockholders, tying up other shares in an option agreement and/or a lockup agreement, and cancelling remaining shares. It was essential to the scheme that the shares that were acquired from the shell be unlegended and therefore appear to be freely tradeable. The next step was the acquisition by the shell of an operating company with an asset that could be publicized to create and support market interest in the stock. The owners of the operating company were given restricted stock that could not be sold except through a registration process. As a consequence, the defendants now controlled the float and they funnelled those shares into the custody of a cooperating brokerage house. At that point, through coordinated trading activity on December 19, the defendants set a floor against which the price of the stock of the merged entity would be measured once the acquisition was publicly announced. Over the following weeks, as they systematically sold their shares into the market created by their activity, the defendants and their associates orchestrated public announcements about the company that contained materially false information. Through their control of the public filings by the company, the defendants kept material information about the terms of the acquisition, the price at which they had purchased the shell's shares, and their control of the float from the public.

The defendants contend that there was no market manipulation of the EOSC stock, that they strongly believed in the value of the company, and that a price per share of over $5 was entirely justified. The short answer to this is that the defendants were *sellers* when the stock price was over $5, a price that Cavanagh and Chachas helped to set. A more comprehensive discussion of this issue, however, is warranted.

The evidence clearly establishes that WTS was a legitimate enterprise with a talented management team and an exciting idea for a product. While the company had made great strides in developing the product, as of January 1998, the product was nonetheless still in the development phase and the company would not know for another half year—at a minimum—whether it had produced a product for which customers would actually place orders. If the company did succeed in getting orders, it would need an immediate and substantial cash infusion to begin manufacturing. If the product worked, the company could be fabulously successful. As of January 1998, however, it was difficult to assess the company's chances for success. If anything, the demonstrations of the technology at the hearing indicate that more work needs to be done to design a dependable product that works efficiently. In any event, WTS's Weaver projected that a market capitalization of approximately $10 to $15 million, or between 50 cents to 75 cents per share (with 21 million shares issued), would be a conservative but reasonable valuation of the company at the point that the entire $4 million—the money that WTS had hired Milestone to find—was invested in the company. Cavanagh did not want to risk waiting, however, for WTS to finish developing, manufacturing, and marketing its product to reap his reward. Nor was he content with the 10% investment banking fee that WTS believed was customary and reasonable. Instead, Cavanagh and Levy located a shell and negotiated purchases of stock that put them in control of the shell. Chachas joined the scheme by arranging sales of unlegended shares, creating an Exchange Agreement that inaccurately described the transaction, filing a materially false and misleading December 23 8–K, and helping through his own trading activity to set the market price at above $5 on December 19. As noted, control

of the float was an important element of the scheme, see *Mulheren,* 938 F.2d at 371, and Chachas agreed to give Cavanagh and Milestone such control in return for being richly compensated beyond any prior expectation that he and the Curbstone Management had held for their investment.

Cavanagh denies that he controlled the float in the EOSC stock. Although he contends that the three Spanish entities that purchased the Curbstone Management shares are not under his control, I find that there is a substantial likelihood that the SEC will be able to prove at trial that all of the shares that were sold to these three entities were under the control of, and indeed owned by, Cavanagh and Milestone. Among the evidence that supports this conclusion is the following. Chachas described these shares as belonging to Milestone on the worksheets he sent to Levy during their negotiations. The Spanish entities were designated as the purchasers at the last moment and without any substantive negotiations being conducted with them by Cavanagh, Levy, or Chachas. All three entities opened up trading accounts at the brokerage house suggested by Cavanagh even before the shares were transferred. Customer Safety "immediately agreed" to resell its shares to Cavanagh. Cavanagh continued to hide his control of the Customer Safety shares by having it appear in the brokerage records as if Customer Safety were directing transfers of those shares to Cavanagh's family, friends, and associates. Cavanagh did not even retain a copy of the Promissory Note that he identifies as requiring him to pay for the Customer Safety shares. Indeed, Cavanagh's disposition of the Customer Safety shares is by itself compelling evidence that he owned all of the shares in the trading accounts of all three entities. Because he owned all of the shares, and was reaping profits of over $4

million from the sales of the Cambiarios shares, he generously gave away the Customer Safety shares, many to repay what he describes as "moral obligations."

The defendants further assert that the $5 stock price, which remained relatively stable over the two and a half months before the SEC acted, is evidence of the market's unmanipulated judgment of the value of EOSC. In this regard they point out that the SEC provided no expert testimony at the hearing regarding the trading activity in EOSC's stock to support its claim of market manipulation. At trial the SEC may more effectively address this pattern of trading, but even without such expert testimony at the hearing it clearly established the following regarding the stock price: (i) WTS's management considered a $5 price per share "astronomical" at this stage of the company's history; (ii) Cavanagh and Chachas manipulated the market on December 19 to set $5 as a base price per share; (iii) the January 12 Future Superstock article was the result of an effort by a Cavanagh associate to create press coverage for the stock, and relied in part on the trading history of the stock in making its extraordinary and irresponsible projection of the company's worth; and (iv) the materially false January 30 press release was orchestrated by Levy and another Cavanagh associate. Thus, although it is unclear at what price the stock would have traded if the natural law of supply and demand had been allowed to set the price, see *First Jersey Secs.,* 101 F.3d at 1466, the SEC has satisfied its burden at this stage of the litigation of showing a substantial likelihood that it would have been far below $5.[68]

### 2. The December 23 8–K Statement

■ The 8–K statement filed with the SEC on December 23, 1997, disclosed the merger between WTS and Curbstone. This

---

**68.** The defendants argue that the statements contained in the January 30 press release, even if false, were not material inasmuch as the price of EOSC's stock shifted only slightly. None of the parties presented sufficient evidence to allow the Court to draw the inference that the defendants press. For instance, the record does not contain a complete set of all public statements made about EOSC during this period so that one could ascertain both when specific pieces of information entered the market and what their effect was on the stock price. Moreover, the record does not contain stock price information for this same period of time for the development companies with whom EOSC was competing, or the companies in its industry, or the relevant stock markets so that one could judge the shift of EOSC's stock price against a standard. Finally, there has been no expert analysis of the trading price and trading volume and their interaction.

document, which was prepared by Chachas with the assistance of documents provided to him by Levy, disclosed to the public the most extensive information to that date about WTS and the terms of the Curbstone/WTS merger.

The SEC claims that the 8–K was misleading because it portrayed the merger as a "stock-for-stock" deal and failed to disclose the additional terms of the transaction. According to the SEC, without the disclosure of those additional terms, the material contained in the 8–K was false and misleading. *In re Time Warner Inc. Secs. Litig.*, 9 F.3d 259, 268 (2d Cir.1993). Chachas has responded by arguing that the SEC's 8–K form, which he followed in preparing EOSC's filing, does not require disclosure of private sales of stock. Because the December 23 filing provided all of the information explicitly required to be disclosed in an 8–K, Chachas claims that it was not misleading. Most importantly, Chachas argues that, if there were material omissions from the 8–K, they were EOSC's responsibility, and not his, to correct.

The Court has reviewed with a fine-toothed comb the 8–K form prepared by Chachas. It has also reviewed the standard 8–K form provided by the SEC to registrants for their use in preparing 8–K filings. Consistent with its finding above that the merger with WTS and the sales of the Management Shares were one integrated transaction, the Court finds that there is a strong likelihood that the SEC will be able to establish at trial that the omission of information from the 8–K regarding these sales, as well as the Regulation S transactions, was material and misleading.[69]

"A duty to disclose arises whenever secret information renders prior public statements materially misleading ...." *Time Warner*, 9 F.3d at 268. The test for materiality in evaluating the omitted information is whether an investor would find the information important. *See TSC Indus., Inc. v. North-*

*way, Inc.,* 426 U.S. 438, 449, 96 S.Ct. 2126, 48 L.Ed.2d 757 (1976). More specifically,

> [a]n omitted fact is material if there is a substantial likelihood that a reasonable investor would consider it important in deciding how to vote [or in this case, whether to purchase a security] .... What the standard does contemplate is a showing of a substantial likelihood that, under all the circumstances, the omitted fact would have assumed actual significance in the deliberations of the reasonable shareholder. Put another way, there must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the "total mix" of information made available.

*Id.; accord Basic Inc. v. Levinson,* 485 U.S. 224, 231–32, 108 S.Ct. 978, 99 L.Ed.2d 194 (1988); *First Jersey Secs.,* 101 F.3d at 1466; *Time Warner,* 9 F.3d at 267–68.

The most glaring omission from the 8–K was the failure to mention the option and sales agreements that had already been concluded at the time of the 8–K's filing, between the Management Shareholders, the Spanish entities, and Milestone. In Item 2, the 8–K described the acquisition simply as an exchange of "all of the issued and outstanding stock of WTS ... for 15,488,120 shares of [Curbstone's] common stock." Although the 8–K disclosed that 3,521,876 shares of Curbstone were issued and outstanding at the time of the merger—and prior public filings, namely the November 6, 1996 S–8, disclosed that 97% of these shares were in the hands of the Management Shareholders—the 8–K did not inform the public that 2,563,000 of those shares had already been sold for less than 4 cents a share, that 150,000 shares had been sold for $3 per share, that 392,000 additional shares were subject to option agreements at substantially higher, increasing prices in the coming four months, and that each of these sales and agreements were part of the compensation

---

**69.** The 8–K form requires an honest and complete "description of the transaction(s) which resulted in the change of control" of the registered company. Since the Court finds that the sales of the Management Shares were a critical part of the transaction that resulted in the merger with WTS, it is likely that the SEC will be able to prove at trial that the omission of information regarding these agreements rendered the December 23 8–K insufficient on its face.

paid to the Management Shareholders for the exchange of the stock.

Counsel for Cavanagh argued persuasively in summation that the average investor would not have cared whether those shares were held by four Spaniards rather than four Californians. The Court finds, however, that the average investor *would* care that those shares had been sold immediately by the owners of the old company, because that information would have conveyed that the prior owners had no intention to continue on as major investors in the new company. Regardless of the identity of the prior owners, their immediate exit might have conveyed a message about the new company that an investor would have cared to evaluate.

The average investor also would care a great deal to know the details of the sales of the Management Shares. Specifically, the fact that the bulk of the shares were sold for less than 4 cents a share, but that the sellers had already negotiated options to sell the remainder for $3, $4, and $5 per share at monthly intervals—to the same buyers who bought the bulk at 4 cents—certainly would have formed an important part of the "total mix of information" available to an investor in determining the price, if any, at which to purchase or sell EOSC stock. This information may even have suggested to an investor, as it has to this Court, that a scheme to inflate the price of the stock was afoot. In any event, there is a strong likelihood that some of these facts "would have assumed actual significance in the deliberations of the reasonable shareholder," *TSC Indus.*, 426 U.S. at 449, regardless of what course that

shareholder or investor would have opted to follow based on the information.[70]

Chachas cannot avoid liability for these omissions based on his interpretation of the 8–K as not requiring the disclosure of private sales of stock. It has long been clear that the antifraud provisions not only prohibit the making of false or misleading statements; they also impose an affirmative obligation to set forth information "necessary to make the statements made, in the light of the circumstances under which they are made, not misleading." Rule 10b–5, 17 C.F.R. § 240.10b–5. *Accord, Charles Hughes & Co.*, 139 F.2d at 437 ("The law of fraud knows no difference between express representation on the one hand and implied misrepresentation or concealment on the other."). Given that the information regarding the merger that was contained in the 8–K conveyed information about only half of the transaction resulting in the creation of EOSC—leaving out information about the compensation that the Management Shareholders received in return for acquiring WTS' stock—Chachas had an obligation to disclose this other information to ensure that the statements that were made were not misleading. The Court therefore finds unpersuasive Chachas' argument that the 8–K disclosed all necessary information.

The description of the exchange of stock is false for another reason as well. It conveys that the WTS shareholders received 15,488,-120 shares of Curbstone's common stock, when they only received 12,022,558 shares. By giving the higher number, the 8–K disguised the fact that Levy, Milestone, and Inversora had each received substantial quantities of EOSC's shares. This omission

**70.** It is important to note that the SEC has belatedly pursued an argument concerning precisely which forms had to be filed with the SEC, by EOSC and/or the Management Shareholders, before the Management Shares could be sold to the public. According to the SEC, these forms would have required the disclosure of significantly more information than did the 8–K form that was filed on December 23, 1997. Because the issue of which forms should have been filed was not mentioned in the complaint, nor raised at the hearing until the SEC's summation, the Court will disregard this issue for the purposes of determining whether the SEC is entitled to the preliminary relief it seeks. Nevertheless, the SEC's failure to address which forms should

have been filed before the shares were sold—and to explain exactly what information that was not contained in the December 23 8–K would have been disclosed through those forms—represents a glaring omission. Understanding the information that the defendants would have had to disclose had they complied with the law would greatly assist the Court, and ultimately a jury, in determining the defendants' liability under Sections 5, 17(a), and 10(b). Specifically, a familiarity with the required disclosures would be of great assistance in understanding the defendants' motive for non-compliance. Because scienter is a necessary element of Section 17(a) and Section 10b claims, motive is of particular significance.

helped to hide the roles played by Levy and Milestone in the transaction,[71] and kept investors uninformed of the $3 million investment that EOSC expected from Inversora. Obviously, investors would be very interested to know that arrangements had already been made for, and stock issued to fund, an investment of an additional $3 million into the company. It would be just as important, however, for them to understand the level of compensation being received by the investment banker and attorney who negotiated this acquisition. Taken together with the information about the compensation paid to the Curbstone Management for the acquisition, this information about the compensation paid to Cavanagh and Levy for negotiating the acquisition would alert a reasonable investor to the fact that WTS was receiving far less from this deal than one would have expected—at least when compared to the compensation received by the Curbstone Management, Milestone and Levy—and give them additional reasons to be wary.[72]

Chachas argues that he may not be held liable for the material omissions in this filing because it was EOSC's responsibility, and not his, to disclose this information. In light of Chachas' intimacy with the details of the transactions at issue, it is disingenuous for him to disclaim liability on the ground that he relied on information provided to him by Levy on behalf of EOSC. The omissions and misleading statements in the 8–K do not pertain to the financial details of WTS. Instead, they pertain to those elements of the acquisition transaction with which Chachas was most familiar, because he negotiated them and/or issued instructions to the transfer agent to effect them.

Moreover, Sections 17(a) and 10(b) are not limited in application to those who are in privity with the entity that is required to make disclosures about material events in its corporate life. By their very terms, these provisions apply to "any person" who makes misleading statements or omits material information in connection with the sale or purchase of a security—which would include an individual who prepared statements as an accommodation to the issuer of the stock—provided that scienter is established. Although the responsibility for full disclosure may have rested with EOSC in the first instance, the record in this case strongly suggests that the people at EOSC were unaware of much of this information. In addition, Chachas did not simply transmit information given to him by EOSC to the SEC. To the contrary, he personally drafted the text of the 8–K filing and the misleading Exchange Agreement, which was filed as part of the 8–K. He also had sufficient independent information concerning the transaction to know that the statement he filed on EOSC's behalf was misleading. Based on all of the circumstances, including the fact that Chachas was by profession a securities lawyer, the Court finds that Chachas knew the part that he was playing in a scheme to inflate the price of EOSC's stock. At the very least, he must have known that the 8–K he filed on EOSC's behalf was materially misleading. Either way, he had sufficient scienter to be held liable under Sections 17(a) and 10(b).

### 3. The January 30 Press Release

Finally, as noted above, the Court finds that the January 30, 1998 press release was likewise materially misleading. The release indicates both that EOSC was close to (if it had not yet reached) the final stage of pro-

---

**71.** The 8–K explicitly represented that no brokers were associated with the merger. Although, at the hearing, Cavanagh declined to characterize his role in the transaction as that of a "broker," it is plain that Milestone, Cavanagh, and/or Levy functioned in this capacity for WTS and Curbstone. Nevertheless, the 8–K does not disclose their involvement, nor the fees that were paid to both Levy and Milestone. Instead, it explicitly represents that there were no brokers involved in the transaction. While the Court is uncertain as to the materiality of this particular misrepresentation, the omission of this information contrib-

utes to the overall misimpression of the course of events generated by the 8–K.

**72.** Finally, the 8–K gave a false and misleading description of the transactions with Agira and Optimum, as described above. It also did not disclose that, as a consequence of the Regulation S sales to these entities, the outstanding shares of EOSC were 21,084,818 and not 19,009,996, as implied by the 8–K, and that the shares had been purchased at a price of less than 50 cents a share.

duction of the unit to be sold to ADL, and that it had a commitment from ADL to purchase a minimum of 1,000 units. Standing alone, the press release therefore constitutes a probable violation of the antifraud provisions. Because the individuals who participated in its drafting, however, are no longer part of this preliminary injunction hearing, were not named as defendants, or—in Levy's case—were not charged on the fraud count, the Court need not assign responsibility for the misstatements. Nevertheless, the press release is persuasive evidence of the existence of the overall scheme alleged by the SEC, orchestrated by Cavanagh, to keep positive information about the company circulating in the marketplace until the defendants had liquidated their holdings.

4. Culpability for Violations of Sections 17(a) and 10(b)

a) Scienter

To find any of the defendants liable for a Section 17(a)(1) or Section 10(b) violation, the Court must find "knowledge or intentional misconduct" or an "intent to deceive, manipulate, or defraud" investors. *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976). *See also First Jersey Secs.*, 101 F.3d at 1467. In the absence of any direct evidence of the defendants' intent, the Court must look to the surrounding circumstances. "Proof of scienter need not be direct, but may be a matter of inference from circumstantial evidence." *Wechsler v. Steinberg*, 733 F.2d 1054, 1058 (2d Cir.1984) (internal quotations omitted). *See also Mayer v. Oil Field Sys. Corp.*, 803 F.2d 749, 756 (2d Cir.1986).

Cavanagh has raised the argument that "there is neither an aiding and abetting, nor a conspiracy cause of action in suits brought under § 10(b) or Rule 10b–5." It should be clear that the Court does not find Cavanagh—or any defendant—liable for a violation of the antifraud provisions on a theory of aiding and abetting or conspiracy. Instead, the SEC has alleged that Cavanagh was a primary violator of the securities laws and the Court finds that Cavanagh was the central figure in the fraudulent scheme. *See First Jersey Secs.*, 101 F.3d at 1471.

The SEC has charged Cavanagh, Milestone, Customer Safety, Cambiarios, Construcciones, Optimum Fund, and Chachas with violations of Sections 17(a) and 10(b).[73] The SEC has met its burden of proof as to Cavanagh by establishing that he was both the prime architect and principal beneficiary of the scheme. As a result, it has met its burden of proof with respect to Milestone and the three Spanish entities as well. Milestone was the vehicle that Cavanagh used to hold himself out as an investment banker and through which he received restricted shares from the acquisition. Substantial evidence supports the strong inference that the three Spanish entities were used by Cavanagh to receive the unlegended stock that Cavanagh bought for himself from Curbstone Management. Cavanagh liquidated approximately two-thirds of those holdings by the end of January, selling about one-third into the market and giving away another third to family, friends, and others. Indeed, any other construction on these events flies in the face of common sense and strains credulity.

■ The SEC has not met its burden, however, of proving that Optimum was an intentional participant in the scheme. Optimum invested $500,000 into WTS/EOSC in return for restricted stock that it has not sold. Even if this investment was critical to Cavanagh's overall plan, no fair inference against Optimum can be drawn from this investment. The SEC's case against Optimum thus hinges on its participation in two of the December 19 trades in EOSC stock that established a new benchmark for the stock, followed thereafter by the receipt of 100,000 shares from the Customer Safety account and the sale of many of those shares. The SEC has not shown, however, that Optimum was doing anything more than relying on Cavanagh's recommendation. As a conse-

---

**73.** The SEC has also claimed that EOSC and Tacopino have violated Sections 17(a) and 10(b). Because of the agreements that these two defendants have reached with the SEC, it is unnecessary to make findings as to whether the SEC has carried its burden of proving a substantial likelihood of success as to the liability of either defendant.

quence, the request for preliminary relief against Optimum is denied.

■ The SEC has shown that there is a substantial likelihood that it will be able to prove at trial that Chachas was a knowing and intentional participant in the scheme to defraud. One of the most difficult questions to answer at this stage of the litigation is how much Chachas understood about the entire market manipulation scheme. The most compelling evidence against Chachas, however, lies in the very documents that he authored, including those reflecting his ever more aggressive bargaining positions during the negotiations with Levy, the intricate maneuvers he undertook to "paper over" his violation of Section 5 and his sale of affiliate stock without registration or restrictive legend, and the false and misleading Exchange Agreement and December 23 8–K. His motivation was clear: he hoped to earn over half a million dollars for each of the Management Shareholders. Of course, the shares that Chachas sold, and the structure of those sales, were essential to Cavanagh's conduct of the scheme. Chachas helped Cavanagh gain control of the market by placing control of virtually all of the unlegended stock in Cavanagh's hands. Finally, the scheme's success was furthered by the materially false and misleading 8–K.[74] In sum, even without weighing the credibility of a single witness, the evidence is compelling that Chachas was a knowledgeable and willing participant in the scheme.

### b) Likelihood that the Defendants will Commit Future Violations of the Securities Laws

■ Based on the Section 5 analysis above, the Court has already ordered the defendants' assets frozen, pending trial, to the extent of all proceeds received in connection with the sale of EOSC stock, as well as any remaining shares owned by the defendants. The Court must now consider whether a preliminary injunction is appropriate

against any of the defendants to prevent future violations of the antifraud provisions.

In so doing, the Court bears in mind once again the factors set forth in *Universal Major Industries*, 546 F.2d at 1048. Because the scheme suggests "systematic wrongdoing, rather than an isolated occurrence," *First Jersey Secs.*, 101 F.3d at 1477, and a high degree of scienter on the part of Cavanagh and Milestone, the Court finds that an injunction is particularly appropriate as to these defendants. As noted above in connection with the Court's consideration of the Section 5 injunction, the Court finds that Cavanagh has a history of misconduct, has acknowledged no wrongdoing, and appears unconcerned by the present allegations. Meanwhile, his profession provides him with constant opportunities to commit future violations of the antifraud provisions. For these reasons, the Court has little hesitation in entering a preliminary injunction against further violations of Sections 17(a) and 10(b) as to Cavanagh and Milestone, and as to Cavanagh's alter egos, Customer Safety, Cambiarios, and Construcciones.

■ A preliminary injunction against future violations of the antifraud provisions as to Chachas is a closer question. Chachas denies any knowledge of the fraudulent scheme and intentional participation it. *First Jersey Secs.*, 101 F.3d at 1477; *Lorin*, 76 F.3d at 461 (protestations of innocence are properly weighed in favor of injunctive relief). Because of his profession as a securities lawyer, he will have an opportunity to repeat the misconduct that he engaged in here. The extent of his participation and the essential role he played in the scheme also weigh in favor of entry of an injunction. Balanced against these findings are the lack of evidence of any prior violation of these statutes or any other misconduct and Chachas' apparent appreciation of the seriousness of the present charges. Moreover, the Court believes Chachas' assertions that he will not violate the fraud provisions of the securities' statutes in the future, not because

---

**74.** The defendants' argument that investors don't usually read SEC filings misses the point. Analysts and reporters who do read the SEC filings are usually the means by which the information contained in those reports and the inferences that can be drawn from them are disseminated into the marketplace.

he has shown remorse, but because the consequences of this litigation have effectively deterred him.

Based on the foregoing considerations, the Court declines to enter a preliminary injunction against future violations of Sections 17(a) and 10(b) against Chachas. Bearing in mind that "the standards of the public interest ... measure the propriety and need for injunctive relief," *Management Dynamics,* 515 F.2d at 808, the Court finds that the public interest will be best served if Chachas is allowed to continue in his profession without the stigma of a preliminary injunction under the fraud statutes. Although a preliminary injunction is a useful device where a court finds that it is necessary to deter future violations, there are cases where an injunction may do more harm than good. Here, the Court finds that the preliminary injunction is not necessary to deter Chachas from future violations. I am influenced in making this judgment by my conclusion that Chachas did not instigate this fraud. Instead, because of greed, he was a willing and active participant in a scheme conceived by Cavanagh and Levy. While the SEC may yet establish at trial that a permanent injunction against Chachas under the antifraud provisions is appropriate, the Court finds that, based on the present record and the Court's present evaluation of the equitable considerations before it, a preliminary injunction against Chachas enjoining future violations of the antifraud provisions would not be in the public interest, and therefore it will not be entered.

### E. *Claims As to the Relief Defendants*

The SEC alleges that each of the relief defendants

> were recipients without consideration of unregistered shares of EOSC in connection with the fraud .... Each of these [relief] defendants profited from the sale of some or all of those shares by obtaining illegal profits under circumstances in which it is not just, equitable or conscionable for them to retain the illegal profits.

The SEC seeks from the relief defendants "the amount of stock and profits by which each has been unjustly enriched as a result of the fraudulent scheme."

It is well established that the securities statutes vest federal courts with jurisdiction over claims against non-violators. *See Deckert v. Independence Shares Corp.,* 311 U.S. 282, 288, 61 S.Ct. 229, 85 L.Ed. 189 (1940); *International Controls Corp. v. Vesco,* 490 F.2d 1334, 1351, 1355 (2d Cir.1974). In addition, the Court has the authority

> to grant any and all necessary remedies to ensure that plaintiff can obtain complete relief. Allowing disgorgement from relief defendants if primary defendants have committed securities violations is an accepted use of this power.

*SEC v. Seibald,* 1997 WL 605114, at *7 (S.D.N.Y. Sept.30, 1997) (citations omitted). That the relief defendants named in this action received shares in EOSC at the direction of Cavanagh has not been disputed.

The SEC has effected service on the following relief defendants: Karen Cavanagh; Cromlix, LLC; Donald & Co. Securities; Joseph Falco; Martin Hodas; Anthony Luttenberger; Ana Lopez; Tamar Lehman; Tim Timlin; Eugene Stricker; Arthur Acutis; and Antonio Borotto. Karen Cavanagh is Thomas Cavanagh's wife.[75] Cromlix is a business jointly owned by Karen Cavanagh and Beverly Nicolois, the wife of Cavanagh's business partner, Frank Nicolois. Donald & Co. is the brokerage house through which most of the trades at issue in this case were made, and which houses accounts for many of the defendants and relief defendants. Arthur Luttenberger is a plumber residing in New Jersey who had made investments in the past with Milestone. Tamar Lehman is the wife of Maier Lehman, who introduced Cavanagh to WTS. Tim Timlin is a childhood friend of Cavanagh's.

The remaining individual relief defendants, according to Cavanagh's testimony, like Luttenberger had invested with Milestone in the past and lost money. Cavanagh therefore

---

**75.** Karen Cavanagh does not appear to have received shares in her own name, but only through her company, Cromlix.

decided to give them shares in EOSC to satisfy what he characterized as a "moral obligation." [76]

■ The only two relief defendants who participated in the preliminary injunction hearing are Tamar Lehman and Tim Timlin. Tamar Lehman received at least 100,000 shares of EOSC stock from Cavanagh, per her husband's direction. These shares were sold in January 1998. The proceeds were deposited into Tamar Lehman's bank account which, pursuant to the TRO, is frozen. Tamar Lehman contends that she has a legitimate claim to the proceeds from the sales of the stock because she received the shares at her husband's direction and he, in turn, had a legitimate claim to them on account of his having introduced Cavanagh to WTS. According to Tamar Lehman, she was not a "nominee" for Cavanagh, and the funds in her account may not be disgorged by the SEC, because Maier Lehman provided consideration for the shares through his services.[77]

■ Timlin received 5,000 shares of EOSC stock at Cavanagh's direction. Timlin sold 2,500 of these shares for $12,927 in January 1998. Like Tamar Lehman, Timlin argues that he gave consideration for the shares. According to both Timlin and Cavanagh, the shares were transferred in consideration for loans that Timlin and his father had provided to Cavanagh in years past. Thus, Timlin, like Lehman, claims that he has a legitimate right to the shares and the proceeds from their sale.

The Court finds the arguments advanced by Tamar Lehman and Timlin unavailing. The Court agrees with Tamar Lehman that her right to the shares depends on her hus-band's right to them, and that she essentially stands in his shoes for purposes of the Court's analysis. The Court also agrees with the proposition advanced by both relief defendants that, in certain circumstances, a relief defendant—like a holder in due course in the context of negotiable instruments—may have a right to assets that cannot be overcome even by the claim of a defrauded seller or investor. This, however, is not that case.

The critical inquiry in determining whether the relief defendant may retain the assets is whether the relief defendant has "no legitimate claim to [the] contested property." *SEC v. Antar*, 831 F.Supp. 380, 400 (D.N.J. 1993). *See also SEC v. Cherif*, 933 F.2d 403, 414–15 (7th Cir.1991); *Seibald*, 1997 WL 605114, at *7. Here, there is no evidence that Cavanagh had control over Lehman's or Timlin's bank or brokerage accounts. These relief defendants therefore are not mere "shells" for Cavanagh. Nevertheless, the Court finds that Lehman and Timlin do not have a legitimate claim to the EOSC shares they received because no consideration was given for the shares. In short, each received the shares as a gift. In both cases, the consideration that is alleged to have been given was actually past consideration. It is hornbook contract law that "past consideration is not valid consideration for a promise." *Pinnacle Consultants, Ltd. v. Leucadia Nat'l Corp.*, 101 F.3d 900, 904 (2d Cir. 1996).[78]

At his deposition and at the hearing, Cavanagh made clear that he conceived of his obligation to transfer the shares to Lehman and Timlin as a "moral" obligation rather than a legal obligation. With respect to Leh-

---

**76.** Cavanagh personally made the decision to give the shares to all of the relief defendants who were served, with two exceptions. Cavanagh testified that he transferred the shares to Eugene Stricker and Tamar Lehman at the request of Maier Lehman.

**77.** Tamar Lehman also argues as a preliminary matter that the shares were freely tradeable and therefore "any profits which Mrs. Lehman received from the sale of these shares did not constitute unlawful profits." The Court need not address this point here, because it has already determined that the SEC has a substantial proba-bility of success in proving that the shares of EOSC stock that Lehman received were affiliate shares, obtained in violation of Section 5.

**78.** The Court assumes for the purposes of this analysis that federal common law, rather than New York law applies. In any event, the result would be the same under either law. Where there is "no material difference between the applicable state law or federal common law standards," the Court need not dwell on a choice of law analysis. *Ciaramella v. Reader's Digest Assoc. Inc.*, 131 F.3d 320, 322 (2d Cir.1997).

man, Cavanagh stated "No, I didn't think I had to give consideration to [Lehman]." Cavanagh testified that he *wanted* to give Lehman shares as compensation for his role in introducing Cavanagh to WTS, but he consistently stated that there was no agreement between the two men that he would do so.[79] Cavanagh also unilaterally decided how many shares he thought constituted an appropriate fee. Even if the Court found that Lehman and Cavanagh had exchanged promises with respect to Lehman's services, the fact that Cavanagh had complete authority to determine the amount of compensation—irrefutably a material term—would undermine a finding that an enforceable contract existed.[80]

Similarly, Cavanagh testified at the hearing that he felt he had no legal obligation to repay the loan to Timlin, only a moral obligation. Indeed, Cavanagh used the term "moral obligation" to characterize his reasons for transferring shares to nearly all of the relief defendants, many of whom, as noted above, were investors who had lost money on investments with Cavanagh in the past. With respect to Timlin, Cavanagh contends that he transferred the shares as partial repayment for loans that Timlin and his father had made to Cavanagh from about 1986 to 1991. Cavanagh testified that he had paid back some of the loans, but that he still owed the Timlins money as of January 1998.

There has been no evidence that the Timlins made any demand to Cavanagh for repayment in January 1998, or at any time since the loans were first made in 1986. The Court therefore finds that Cavanagh's unilateral decision to transfer 5,000 shares to Tim Timlin in consideration for the loans is insufficient to establish that Timlin has a legitimate claim to the shares. As the court noted in *Antar*, "[a]s between the [relief] defendants and the victims of fraud, equity dictates that the rights of the victims should

control." 831 F.Supp. at 402–03. Accordingly, the Court finds that the shares and proceeds held by Timlin, and the proceeds from sales of EOSC shares held by Lehman, should remain frozen pending a final resolution of this action.

## III. *CONCLUSION*

For the reasons set forth above, the Court finds that the SEC has established a substantial likelihood of success in proving that the following defendants violated Section 5 of the Securities Act: Cavanagh, Milestone, Customer Safety, Cambiarios, Construcciones, Optimum, Agira, Levy, Chachas, Brooksbank and Hantges. Accordingly, the Court orders the assets frozen of these defendants to the extent of all proceeds received from sales of EOSC shares, except with respect to Cavanagh and Milestone. Because the Court has concluded that all of the Management Shares transferred to Customer Safety, Cambiarios, Construcciones, and Inversora were effectively under the control of Cavanagh and Milestone, the amount of the freeze order as it applies to Cavanagh and Milestone shall include the proceeds from the sales of any of those shares, including sales by those who received Customer Safety shares, unless those shares or proceeds have already effectively been frozen.

To the extent that any of the defendants have already reached agreements with the SEC as to the precise dollar amount of their assets that shall remain frozen, those agreements shall remain in force pending a final resolution of this case. Any EOSC shares that remain in the custody or control of these defendants shall remain frozen as well, except for the Regulation S shares received by Optimum and Agira, which are not subject to the freeze. Any defendant that has not already provided a complete accounting of assets must do within five days of the date of this Opinion.

**79.** In contrast, Cavanagh signed an agreement with Weiss and Friedman promising to transfer 75,000 EOSC shares to each of them for their role in the introduction. No such agreement is alleged to have been made orally or in writing with Lehman.

**80.** Cavanagh actually did not give Lehman the 100,000 shares, but instead the right to purchase

the shares at a price of $3 a share. Since the stock was then trading at about $5 a share, the "fee" paid to Lehman would have been the difference of $2 per share—or approximately $200,000. No payment has been made by Lehman for the shares, nor has any payment been demanded by Cavanagh.

The Court enters a preliminary injunction against future violations of Section 5 as to the defendants Levy, Cavanagh, Milestone, Customer Safety, Cambiarios, Construcciones, and Chachas.

The Court finds that the SEC has established a substantial likelihood of success in proving that the following defendants violated Sections 17(a) and 10(b): Cavanagh, Milestone, Customer Safety, Cambiarios, Construcciones, and Chachas. Accordingly, the Court finds that an asset freeze, with the same terms as outlined above with respect to the Section 5 freeze, is warranted as to these defendants. The Court enters a preliminary injunction against future violations of Sections 17(a) and 10(b) against Cavanagh, Milestone, Customer Safety, Cambiarios, and Construcciones.

The Court orders frozen the assets of the relief defendants who have been served, to the extent of all proceeds from sales of EOSC shares. Any EOSC shares that remain in their custody or control shall remain frozen as well.

The SEC shall submit within three days a proposed final order consistent with this Opinion for the Court's signature. The defendants shall have three days thereafter to submit objections to the language of the proposed final order.

SO ORDERED.